234 So.2d 833 (1970)
John Wilson McDANIEL
v.
Ernest WELSH et al.
Margaret A. OWENS
v.
Ernest WELSH et al.
Nos. 7947, 7948.
Court of Appeal of Louisiana, First Circuit.
April 13, 1970.
Rehearings Denied May 25, 1970.
*835 John T. Caskey, Jr., Baton Rouge, for appellants.
Dodd, Hirsch, Barker, Avant & Wall, by John L. Avant, and D'Amico, Curet & Bush, by Sam J. D'Amico, Baton Rouge, for appellees.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
These consolidated cases arise from a two car intersectional collision allegedly occasioned by the malfunctioning of a traffic control signal situated at the intersection of Florida Boulevard and North 22nd Street in the City of Baton Rouge. Defendant, Parish of East Baton Rouge (Parish), appeals from judgment in favor of plaintiff, John Wilson McDaniel, for the death of his major daughter, Katie McDaniel, and in favor of plaintiff, Margaret A. Owens, for personal injuries and related medical expenses. We affirm the judgments rendered below.
The accident occurred at approximately 9:00 P.M., July 5, 1966. Mrs. Owens, accompanied by her guest passenger, Katie McDaniel, was proceeding southerly along North 22nd Street, a multi-laned roadway, in the right or outside southbound lane. She proceeded into the intersection with Florida Boulevard (Florida) on a green or favorable traffic signal. The Owens vehicle was struck on its right side by an eastbound vehicle being driven by Ernest Welsh who was traveling in the left or inside eastbound lane of Florida, a multi-lane thoroughfare. The traffic signal facing Welsh as he entered the intersection was, allegedly, not operating.
Mrs. Owens made demand upon the Parish, the City of Baton Rouge, and Welsh. Mr. McDaniel sued the Parish, the City, Mrs. Owens and her insurer, Great American Insurance Company. Both actions against the City were dismissed on peremptory exceptions and no appeal was taken in either instance. The trial court held that the sole proximate cause of the accident was the failure of the Parish to either inspect, properly maintain or properly repair the traffic signal. Both actions were dismissed as to all remaining defendants. The Parish has appealed. Neither plaintiff has appealed or answered the appeal taken by the Parish.
The record shows that the intersection in question is a crossing of two major thoroughfares. At the scene Florida is a four-lane roadway and North 22nd Street consists of six lanes. The intersection is controlled by a battery of electric semaphore traffic signals with standard red-yellow-green lights excepting that there are double red lenses for stop in combination with left turn arrows on all four sides of the crossing. Right turn arrows are also provided for north and south bound traffic on North 22nd Street. The lights are regulated by a control system consisting of an electromatic three phase controller, Model 1033, and six S-R-4 relays, one for each of the system's six signal circuits. The controller and relays are contained in a box affixed to a utility pole at one corner of the intersection.
It is conceded that at 11:30 A.M. on the morning of the accident, Claude L. Cranfield, *836 a Parish traffic device maintenance man, was dispatched to the intersection in response to a report that the right turn arrow controlling northbound traffic on North 22nd Street was malfunctioning in that it was "flickering". Cranfield replaced the controller which operated all the signals. He noted that this corrected the reported difficulty, but he did not check the remaining facets of the lights. At approximately 4:45 P.M., on the afternoon of the accident, Ortho R. White, traveling easterly on Florida, observed that the red light controlling east bound vehicles was non-operative. This information was relayed to the City Police Department and at approximately 5:18 P.M. City Policeman James Eusey was sent to investigate. Officer Eusey observed the signals for approximately five full cycles. Finding all lights to be in good order, he departed the scene. This accident occurred at approximately 9:00 P.M.
The Owens vehicle was being followed by a City garbage truck driven by Ervin J. King. The Welsh car was proceeding ahead of an automobile being driven by Patrick Dixon. Both following drivers were eye witnesses to the accident.
Mrs. Owens' testimony is simply that she has no recollection of the accident or the events immediately prior thereto.
King's testimony is that he was accompanied by two fellow employees. He was returning to the City motor pool after having worked overtime. Proceeding in the outside southbound lane approximately 30 feet behind Mrs. Owens, King became irked at her slow speed. He was positive the light was on green for southbound vehicles on North 22nd Street when Mrs. Owens entered the intersection and he entered behind her while the light was still green. One of his fellow workers called his attention to the Welsh vehicle approaching from the west on Florida. He then glanced to his right and observed Welsh coming at an estimated speed of 65 miles per hour. He stated that the force of the impact cleared the intersection of both vehicles permitting his passage without becoming involved in the collision. After stopping his car on the shoulder of Florida, he observed Miss McDaniel lying on the pavement in the intersection and saw her move one time. He observed Mrs. Owens lying on the seat of her car, partially in and partially outside of her vehicle. He noted she was unconscious, bleeding, moaning and groaning.
Patrick Dixon testified he was proceeding easterly along Florida and stopped at 19th Street (west of the scene of the accident), in the outside lane, behind a Ford automobile. Welsh's car was stopped in the inside lane at 19th Street abreast of the Ford. Dixon noted some conversation between the occupants of the vehicles ahead, and when the light turned green, both of the forward vehicles jumped off way out in front. Dixon was approximately 300 feet west of the Welsh car when Welsh approached the intersection at North 22nd Street. Dixon was positive the signal at North 22nd Street was not in operation as Welsh approached. He noted that it was quite dark and that even though he was familiar with the intersection, he did not see the light fixture suspended over the roadway. He stopped at the scene and directed the attention of the investigating officer to the fact that the light at North 22nd Street was functioning intermittently for traffic traveling easterly on Florida.
It was stipulated that Mrs. Dixon, a passenger in the Dixon car, would confirm her husband's testimony.
Defendant Welsh testified he was traveling easterly in the inside lane of Florida, at about 45 miles per hour, accompanied by Mary Toussaint. He did not see a traffic signal at the intersection of Florida and North 22nd Street. He variously estimated his distance at from 10 to 50 feet from the light when he saw the non-functioning signal. He stated the accident was imminent when he observed the Owens vehicle. He also stated he applied his brakes but to no *837 avail. Welsh, who was approximately 30 years old, stated he had lived in Baton Rouge all his life but had been driving only two or three years prior to the accident and was not aware of the signal at this particular intersection. He denied that he was drag racing with the Ford automobile mentioned by Dixon. Welsh explained that his vehicle was a 1955 model car and that because the carburetor was defective, the automobile would not travel much faster than 45 miles per hour.
Miss Toussaint's testimony is that her host was proceeding at about 35 miles per hour. She did not see the Owens car prior to the accident but was aware of a Ford traveling next to the Welsh car. She was certain the light at North 22nd Street was green as Welsh approached that intersection.
The accident was investigated by Officers Ray Cook, William L. Weaver and James Eusey. Cook testified the eastbound red traffic light on Florida was malfunctioning intermittently after the collision. Cook directed Weaver's attention to this circumstance. He also stated a passenger in the garbage truck advised him that the Owens vehicle proceeded through the intersection on a green light. Cook's investigation disclosed no evidence of skid marks left by the Welsh car. Officers Weaver and Eusey verified Cook's testimony concerning the intermittent malfunctioning of the eastbound Florida Street red light following the accident.
Mr. Cranfield acknowledged changing the controller on the morning of the accident. After the accident, he was again summoned to the scene, arriving at approximately 10:30 P.M. He remained at the intersection until 12:30 A.M. the next morning and observed no malfunctioning of the light. He also noted that the controller he installed had been repaired in the Parish's maintenance and repair shop. He could not explain why the light malfunctioned at and just after the time of the accident but worked properly for the two hour period he was at the scene. Following the accident, as a matter of precaution, he readjusted the S-R-4 relay which controlled the red signal for eastbound Florida traffic. It was Cranfield's opinion that the previously observed failure resulted from either (1) a bad contact in the main controller; (2) a loose wire in the signal itself, or (3) a poor contact in the S-R-4 relay which controlled the light that failed to operate. He acknowledged that on the day after the accident, on orders from his superiors, he replaced the traffic controller he installed the day before.
City Traffic Engineer, Duaine T. Evans, assigned the malfunction to either failure of the relays, failure of the controller or a loose connection in the wiring. He acknowledged that traffic signal short circuits frequently correct themselves. He also acknowledged that no further problem was encountered with this particular light after the controller was replaced on the day following the accident.
Appellant Parish maintains the trial court erred in (1) declining to recognize defendant's immunity from liability and suit; (2) finding the Parish possessed notice of the malfunctioning; (3) holding the Parish guilty of negligence in failing to properly inspect, repair and maintain the traffic signal; (4) exonerating defendant Welsh from liability, and (5) awarding both plaintiffs excessive damages.
We consider first the question of immunity which is urged only in defense of the McDaniel action. We note that plaintiff Owens has obtained legislative waiver of immunity as regards her claim against both the City and Parish.
If immunity exists herein, as contended by defendant Parish, we find that it has been waived. It is conceded the accident occurred within the City limits of Baton Rouge. In Hamilton et al. v. City of Shreveport, 247 La. 784, 174 So.2d 529, it was held that pursuant to Article 3, Section 35 of the Constitution, where the Charter of the City of Shreveport stipulated that *838 the municipality was "capable of suing and being sued", the city had no immunity from suit whether acting in a governmental or proprietary capacity, irrespective of whether the charter was granted prior or subsequent to the effective date of Article 3, Section 35, above. The same result was reached in Pierce v. Fidelity and Casualty Company of New York, et al., La.App., 205 So. 2d 831, and Lambert v. Austin Bridge Company, La.App., 189 So.2d 752.
On January 1, 1949, a combined plan of government for the Parish of East Baton Rouge and the City of Baton Rouge, became effective pursuant to Article 14, Section 3(a) of the State Constitution. Sections 1.02 and 1.03 of the plan of government declares that the City and Parish shall retain their respective identities as political subdivisions. It further declares that both entities retain all privileges, powers and duties possessed prior to January 1, 1949, insofar as they do not conflict with the new combined plan. Pursuant to the foregoing declaration, the Official Appendix to the combined plan recites:
"The following sections or portions thereof of Act 169 of 1898, as amended, have been set forth below for convenience only since they appear to be, either in whole or in part, still in full force and effect. In view of the Provisions of Section 1.03 of the Plan of Government, the section set forth below should be considered in light of pertinent provisions of the Plan of Government to determine whether any conflict exists."
Section 1 of Act 169 of 1898 confers on the City of Baton Rouge the capacity to sue and be sued.
It is conceded the obligation to maintain traffic signals throughout the entire City and Parish has been assumed by the Parish under the City-Parish Plan of Government. Because of the "sue and be sued" provision applicable to the City, the City was clearly subject to suit in all matters pertaining to its operation of traffic control devices. The immediate question, therefore, is whether the Parish, having assumed the City's obligation to maintain traffic control signals, is also subject to suit arising therefrom even though there be no express provision authorizing the Parish to sue and be sued.
In Carlisle v. Parish of East Baton Rouge, La.App., 114 So.2d 62, we expressly held that since the City of Baton Rouge could not assert immunity with regard to street repair and maintenance, the Parish of East Baton Rouge, having assumed the responsibility for street repair and maintenance pursuant to Article 3, Section 3.01(b) of the City-Parish Plan of Government, could not assert such immunity. In this regard, Carlisle states:
"Although for administrative efficiency the city and parish street departments were consolidated and the responsibility for the maintenance of the city streets was vested in the parish council, we do not believe that this circumstance furnishes a sound reason for holding that the historic liability of the governing authorities responsible for maintaining municipal streets in safe condition no longer obtains in the City of Baton Rouge and that this activity is now shielded by governmental immunity. It is apparent that the same reasons rendering non-immune the negligent maintenance of municipal streets (see, e. g., Clinton v. City of West Monroe, La.App. 2 Cir., 187 So. 561 at page 564) apply equally whether the maintenance of the city streets is done by a combined city-parish street department or by the city itself. And, in fact, the parish council was held liable for street defects in Brantley v. City of Baton Rouge, La.App. 1 Cir., 98 So.2d 824, certiorari denied.
* * * * * *
"The combined city-parish government for the metropolitan area of Baton Rouge is a most modern attempt to achieve responsible and efficient government for an urbanized area. We feel it would be inappropriate to shackle to *839 this new twentieth century form of government the medieval concept of governmental irresponsibility for damages arising from negligently maintained municipal streets, otherwise not applicable save (allegedly) for the change of governmental plan."
Should traffic signal maintenance be deemed to fall within the jurisprudentially created non-immunity rule for streets and sidewalks, the Parish, having assumed responsibility for traffic signals, could not assert immunity under the express ruling in Carlisle. Carlisle would dictate the same result even though traffic signals are not deemed to be within the non-immunity rule pertaining to streets and sidewalks. This is so because Carlisle stands for the fundamental proposition that a governmental body assuming the responsibilities of another governmental body for which the latter body cannot assert immunity, cannot itself assert immunity pertaining to these assumed functions. This rule is operative irrespective of the source of the non-immunity of the transferring governmental body. In the instant suit the City is certainly prevented from claiming immunity by virtue of the "sue and be sued" clause of its charter with regard to the maintenance of traffic signals. The Parish, having assumed the responsibility for traffic devices, cannot terminate the recourse to suit enjoyed by citizens since 1898 for defective traffic signal maintenance and operation.
The views herein expressed are limited to streets and traffic signals situated within the municipal limits of the City of Baton Rouge.
As regards Welsh's alleged negligence, we find that his testimony, corroborated by the disinterested witness, Dixon, establishes that the red or stop light controlling eastbound Florida Boulevard traffic was not in operation when Welsh entered the intersection. This testimony also shows that the overhanging fixture was difficult to see until a motorist was virtually upon the intersection. The testimony of the several officers who investigated the accident confirms the malfunctioning of the light following the accident. Although Cranfield testified the light worked properly during his two hour observation after the mishap, this does not negate the positive testimony of three officers that the light malfunctioned after their arrival at the scene. It also appears that Welsh was not familiar with this particular intersection and had no reason to anticipate a traffic signal at that location. Welsh did not see either the Owens vehicle or the nonfunctioning light until he was practically into the intersection and an accident was inevitable. Photographic evidence discloses that to the right or south of an eastbound driver on Florida Boulevard, North 22nd Street is obscured by a cemetery wall. Considering the accident occurred at night, we find no fault in Welsh entering the intersection under the circumstances. Nor do we find Welsh negligent in traveling at excessive speed. We place little weight on King's estimation of Welsh's speed to be approximately 65 miles per hour. The legal limit in the area was 45 miles per hour. We find, as did the trial court, that Welsh may have been traveling slightly in excess of the limit. However, violation of a speed law does not render a motorist liable unless the infraction is a cause in fact of the accident. A cause in fact is one without which an accident would not have occurred. Arnold v. Griffith, La.App., 192 So. 761. It must also be a substantial causal factor to render a motorist liable. Dixie Drive It Yourself Sys. New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298. Had Welsh been traveling at a speed of 45 miles per hour, he could not have avoided this particular accident.
In considering the alleged negligence of the Parish, we note its complaint that the trial court applied the doctrine of res ipsa loquitur in holding defendant Parish liable. We have reviewed the record and find that whereas the principle of res ipsa loquitur is mentioned by the trial court, the court *840 did not in fact hold the rule of res ipsa loquitur applicable herein. We further note that the trial court expressly found defendant Parish negligent in failing to properly maintain or repair the light after notice of its malfunctioning. Res ipsa loquitur is not invoked by any litigant herein. In view of our finding specific negligence on defendant's part, there is no need to consider whether the doctrine of res ipsa loquitur is applicable herein.
The record does not establish the precise cause of the light's failure. It is shown that the malfunction resulted from either failure of the controller, failure of the relay controlling the particular signal in question, or defective wiring. The burden is on plaintiff to establish his case by a preponderance of evidence. This means plaintiff must show it is more probable than not that defendant was negligent and that such negligence was the cause of plaintiff's injury or loss. Perkins v. Texas and New Orleans Railroad Company, 243 La. 829, 147 So.2d 646. Proof by preponderance of evidence may be not only by direct evidence but also by circumstantial evidence which excludes other reasonable hypotheses with a fair amount of certainty. Gassiott v. Gordey, La.App., 182 So.2d 170; Valentine v. Kaiser Aluminum & Chemical Corporation, La.App., 205 So.2d 757. Causation may be established by circumstantial evidence which need not necessarily exclude all other possible causes. Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395.
We preface our discussion of defendant's negligence by noting that as a matter of law a high degree of care must be exacted of those whose obligation it is to maintain traffic signals. We deem this rule necessary by the very nature of things. We judicially note that in municipalities, especially metropolitan areas, vehicular congestion on the public streets is constantly increasing. We deem it reasonable to conclude that increasing traffic volume poses new and added control problems to those authorities charged with the obligation of regulating automobile traffic. The greater the volume of traffic, the greater is the need for effective vehicular control, which includes properly functioning signals upon which motorists may rely with confidence.
Here, Mr. Cranfield, who checked the light for a malfunctioning turn arrow on the morning of the accident, merely changed the entire controller. It is significant that Cranfield replaced the controller with a similar device that had been repaired by the Parish's repair department and that thereafter a different malfunction developed. After satisfying himself that this procedure corrected the precise trouble reported, he left the scene without checking the signal further. Because the new controller operated all the signals, he should have checked all the lights to determine if they were properly operative. This is especially so since the light was located at a major intersection. The malfunctioning on the afternoon of the day of the accident was reported to the City Police who dispatched Officer Eusey to the scene. His more or less cursory check disclosed no disorder. The testimony of the officers and Mr. Cranfield reveals an arrangement whereby traffic light problems are relayed to the Parish by the City Police. Cranfield's testimony indicates members of the repair department are on 24 hour call for such emergencies. This is also attested by the fact that Cranfield was notified by City Police following the accident. That the problem encountered in the afternoon was not reported to the Parish is a matter of no consequence under the circumstances. The report to the City Police must be deemed notice to the Parish. The malfunctioning light was permitted to operate for approximately four hours after the Parish must be deemed to have notice of its improper functioning. We conclude defendant Parish was negligent in not making a proper inspection and examination of the signal after the malfunction was reported, not taking adequate measures to correct the *841 defect, and allowing the malfunction to continue an unreasonable length of time following notice thereof. We also find its negligence was the sole cause in fact of the accident. A properly functioning traffic signal would have prevented the exact type of accident which happened.
In passing we note the Parish's complaint that the trial court improperly permitted introduction of evidence showing the traffic signal was repaired on the morning following the accident. Such evidence is not admissible. Givens v. De Soto Bldg. Co., et al., 156 La. 377, 100 So. 534. However, no prejudicial error resulted from its admission in the case at hand. This particular evidence excluded, we find ample evidence of record to support the finding of negligence on appellant's part.
Mrs. Owens was seen in the hospital following the accident by Dr. Joseph Nasca, Surgeon. He found the patient in slight shock and suffering from bruises and abrasions of the face, deep lacerations above the nose and right eye and dislocation of the second cerival vertebra. Mrs. Owens also complained of pain in the rib cage and the sensation of her ears being "stopped up". While in the hospital, Mrs. Owens experienced facial paralysis which was attributed to nerve injury resulting from the lacerations and abrasions. Mrs. Owens remained in the hospital until July 12, 1968. On July 18, she returned to Dr. Nasca who referred her to Dr. Lawson G. Cox, an ear, nose and throat specialist. Mrs. Owens has a slight permanent scar above her right eye.
Dr. Cox's examination of Mrs. Owens on July 19, 1966 disclosed impairment of hearing which was attributed to a general derangement in the area of the middle ear. Dr. Cox also noted 90% facial paralysis on the right side. An examination of August 12, 1966 showed 20-30% recovery of function of facial muscles and some improvement in hearing. On August 25, 1966 he found Mrs. Owens' hearing normal but noted only slight improvement of her facial muscles. On September 20, 1966, he noted 70% recovery of the function of the facial muscles. On December 15, 1966, during an office visit, Dr. Cox removed cystic lesions from the scar tissue on the right side of Mrs. Owens' face. He stated that the patient's hearing is now normal but there would be no further improvement in the scars. He considered that her facial paralysis has almost completely disappeared. While the facial paralysis persisted, Mrs. Owens could not close her mouth or her right eye, she could not purse her lips and she experienced difficulty in eating and drinking. The trial judge noted that Mrs. Owens still exhibited minimal evidence of facial paralysis and that her facial scarring was noticeable but not disfiguring.
Dr. Irby Dupont, optometrist, treated Mrs. Owens for a burning and stinging sensation in the right eye after the accident. He found the patient could not wear her contact lens for extended periods due to her inability to blink her right eye. Dr. Dupont explained that the blink rate determines eye fluid level and that inability to blink results in drying of the cornea causing discomfort when contact lenses are used. He found a slight impairment of vision in Mrs. Owens' right eye which was attributed to the accident and which loss was uncorrectable. Dr. Dupont also testified that Mrs. Owens has not been able to satisfactorily wear contact lenses since the accident and that the eye injury could be the cause of the headaches of which she complained.
The trial court awarded Mrs. Owens the sum of $9,333.80, of which amount $8,475.00 was for her pain, suffering, and residual injuries. We believe the award does substantial justice between the parties.
Our law is settled to the effect that there is no basis for a survival action (damages for pain and suffering experienced by a deceased person) unless the decedent was conscious following the injury. *842 Todd v. New Amsterdam Cas. Co., La.App., 52 So.2d 880; Dauzat v. Great American Indemnity Company, La.App., 130 So.2d 805.
Plaintiff must prove every element of his claim. Foggin v. General Guaranty Ins. Co., La.App., 207 So.2d 176.
It is not shown that Miss Katie McDaniel was conscious following the accident. Mr. Ervin J. King testified that he observed decedent move one time while she lay on the street before being removed to the hospital. Dr. Nasca testified he saw decedent in the emergency room of the hospital at 9:45 P.M., July 5, 1966, and that she died at 10:00 P.M. that same evening. Under these circumstances, there can be no award for the survival action brought by plaintiff McDaniel.
The record discloses a close relationship between decedent and her father, John Wilson McDaniel. Decedent was 22 years and six months of age at her death. She lived with her parents until one year after her graduation from high school. After the death of her mother in 1962, decedent attended trade school with her father's financial assistance. For approximately two years preceding her death, decedent did not live with her father but visited him practically every week end. Mr. McDaniel has one other daughter and two sons.
Appellant cites authorities wherein less than the sum of $12,500.00 has been awarded a parent for the loss of a daughter. It must be recalled, however, that considerable discretion is vested in the trial court in matters of this nature. We find no abuse of discretion in the lower court awarding $12,500.00 to plaintiff McDaniel herein for the loss of his daughter, plus special damages in the sum of $1,403.08.
It is ordered, adjudged and decreed the judgment of the trial court in each of these consolidated matters be and the same is hereby affirmed.
It is further ordered, adjudged and decreed that defendant Parish of East Baton Rouge be cast with all costs, on trial and appeal, for which political subdivisions are liable according to law.
Affirmed.