255 So.2d 861 (1971)
Garland L. BOURGEOIS, Jr., Individually and for the Use and Benefit of his Minor Son, Garland L. Bourgeois, III
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF HIGHWAYS, et al.
Barbara BOURGEOIS, wife of/and Garland L. Bourgeois, Jr.
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF HIGHWAYS, and Mt. Beacon Insurance Company of New York.
No. 4674.
Court of Appeal of Louisiana, Fourth Circuit.
December 6, 1971.
Rehearings Denied January 10, 1972.
*862 Frank J. D'Amico, New Orleans, for Garland L. Bourgeois, Jr., etc. plaintiff-appellee.
George H. Jones, New Orleans, for Barbara Bourgeois, etc., plaintiffs-appellants.
Montgomery, Barnett, Brown & Read, John P. Hammond, New Orleans, for United Services Automobile Association, defendant-appellant.
Bienvenu & Culver, Hugh M. Glenn, Jr., New Orleans, for Hanover Ins. Co., defendant-appellant.
Norman L. Sisson, Robert J. Jones, Baton Rouge, Jesse S. Guillot, New Orleans, for The State of La., Dept. of Highways, defendant-appellee.
Before REGAN, STOULIG and BOUTALL, JJ.
REGAN, Judge.
The plaintiff, Garland L. Bourgeois, Jr., filed this suit individually and on behalf of his minor son, Garland L. Bourgeois, III, against the defendant, The State of Louisiana, through the Department of Highways, United Services Automobile Association, The Hanover Insurance Company, and Mt. Beacon Insurance Company of New York, endeavoring to recover the sum of $233,438.20, representing damages for personal *863 injuries suffered by his son and medical expenses incurred in his treatment, all of which he alleges resulted from the negligence of the Louisiana Department of Highways, his wife, Barbara Bourgeois, and one Carmel Morgan, the operator of a vehicle with whom his wife collided in the intersection of Veterans Memorial Boulevard and Williams Boulevard in Jefferson Parish, Louisiana.
The defendants answered and denied the plaintiff's accusations of negligence. In addition, United Services Automobile Association filed a third party petition against the Louisiana Department of Highways maintaining that it be indemnified for any amount for which it might be cast in judgment.
This suit was consolidated with a similar one filed by Barbara Bourgeois and her husband, Garland L. Bourgeois, Jr., endeavoring to recover damages for personal injuries and medical expenses sustained by Mrs. Bourgeois in the same accident.
After a trial on the merits, judgment was rendered against United Services Automobile Association in the amount of $25,000.00, The Hanover Insurance Company in the sum of $5,000.00, and Mt. Beacon Insurance Company of New York in the amount of $5,000.00.[1] The lower court then dismissed the plaintiff's suit and the third party demand by United Services Automobile Association against the Louisiana Department of Highways.
In addition, a prior settlement having been made between Mr. and Mrs. Bourgeois and Mt. Beacon Insurance Company, the lower court rendered judgment in favor of the remaining defendant, The Louisiana Department of Highways, and dismissed Mrs. Bourgeois' suit.
From the judgment rendered against it, The Hanover Insurance Company and United Services Automobile Association appealed. The plaintiff answered the appeal seeking a judgment against the Louisiana Department of Highways and endeavoring to obtain an increase in the award made by the lower court.
In the consolidated proceeding, Mrs. Bourgeois and her husband have also appealed the lower court's adverse ruling.
The record discloses that the collision occurred on September 5, 1967, the day after Labor Day. The plaintiff had taken the family car to work, and Mrs. Bourgeois borrowed a neighbor's vehicle, insured by United Services Automobile Association, in order to bring her two year old son to a doctor for treatment of an asthma attack. On her way to the doctor, she drove in an easterly direction in Veterans Boulevard and at approximately 8:30 A.M. she reached its intersection with Williams Boulevard, a heavily traveled thoroughfare which runs in a north and south direction and crosses Veterans Boulevard at right angles.
At that time she noticed that the traffic semaphore signal light controlling the intersection was malfunctioning in that it remained red for traffic in Veterans Boulevard. When she realized that the light was not going to change she carefully crossed the intersection without incident and proceeded to the doctor's office.
She returned from the doctor's office by way of Veterans Boulevard, driving in a westerly direction, and reached its intersection with Williams Boulevard at approximately 11:30 A.M. She testified that she was driving at a speed of between twenty and twenty-five miles per hour and she noticed that the light had been changed from red for traffic on Veterans Boulevard to green. She also related that because of this change she assumed that the traffic light had been repaired and proceeded to cross Williams Boulevard as though the light was operating in a normal manner. As she entered the intersection, the Morgan vehicle, insured by Mt. Beacon Insurance Company of New York, entered her pathway *864 and a collision ensued. As a result thereof Mrs. Bourgeois suffered a broken leg and a lacerated lip, and her young son incurred grievous head and brain injuries.
United Services Automobile Association, as insurer of the vehicle being driven, and The Hanover Insurance Company, as insurer of Mr. Bourgeois' automobile, vigorously insist that the record does not disclose any negligence on the part of Mrs. Bourgeois. On the contrary, they argue that since Mrs. Bourgeois was faced with a green light, she was entitled to drive across the intersection and assume that vehicles at right angles to her would stop in obedience to the red light facing them.[2] In view of the facts developed herein we reject this argument because it is without merit. Only three hours before, Mrs. Bourgeois was forced to carefully negotiate the same intersection under the hazards presented by the same malfunctioning traffic light. By her own admission, she conceded that on her return trip from the doctor's office she remembered that this was the light that had malfunctioned and had expressed mental relief to herself that it had apparently been repaired. We are convinced that, in view of the malfunction of the light only three hours prior to her return, she was not entitled to the ordinary presumption afforded a driver approaching an intersection in the face of a green light. On the contrary, her prior notice on the same morning of the malfunction of the light placed upon her an obligation to exercise diligent caution in recrossing this intersection in the absence of affirmative knowledge that the necessary repairs had been effected. As stated in Vidrine v. General Fire & Casualty Company,[3] the driver is guilty if he carelessly enters intersections without adequate observation and care in the face of a traffic signal which is out of order. In view of the negligence of Mrs. Bourgeois, the lower court was correct in casting United Services Automobile Association and Hanover Insurance Company in judgment and in dismissing Mrs. Bourgeois' case against the Louisiana Department of Highways.
The next question posed for our consideration is whether the Louisiana Department of Highways was guilty of negligence which was a proximate cause of young Bourgeois' injuries. The record discloses that the traffic light had been malfunctioning on Saturday, Sunday, and Monday before the accident. Lieutenant Salvadore Lee, a veteran employee of the State Highway Department, Troop B, testified that he had received numerous telephone calls since Saturday before the accident relative to the malfunctioning light in the intersection. He likewise said he made numerous calls on Saturday, Sunday and Monday to the Highway Department in order to report the complaints. He remembered the incident clearly since his troop received much verbal criticism because the Highway Department did not take any action in response to his calls. He explained that it was regular procedure for the State Police to call the Highway Department when complaints were received by it concerning a malfunctioning traffic light.
Moreover, Raymond G. Junker, also a State Trooper connected with Troop B testified that he had investigated an accident which occurred at 3:30 P.M. on Monday, September 4, the day before young Bourgeois was injured. At this time the signal lights were still frozen on red for traffic using Veterans Boulevard and on green for traffic using Williams Boulevard. It was stipulated by respective counsel that this trooper reported the malfunctioning light to the Highway Department at 4:00 P.M. on Monday, September 4, and that the Department had actual notice of the malfunction at that time.
Ellis Sapia, Jr., an electrician foreman employed by the Department of Highways in its Marrero district, testified that according to his records he telephoned an employee, *865 William Potts, at 4:30 P.M. on September 4 and instructed him to go to the intersection and effect the necessary repairs. While he had no personal knowledge of what work was actually performed by Potts, his records indicated that the latter installed an MM-3 controller. Potts had no independent recollection of what he did at the intersection, but testified from his notes only. In addition, he did not know whether he performed repairs to the light between 3:30 P.M. and 7:15 P.M., when another accident occurred at the intersection.[4] According to Potts, his notes show only that he checked the MM-3 controller, a device which affects turn signals, and he did not check anything else. He admitted that if he found one thing wrong with a traffic signal, he did not check anything else if that seemed to solve the problem. According to Potts, the signal system at the intersection had 4 MM-3 controllers and one 1022 controller, which was the main controller for through traffic. He significantly related that he was not equipped for handling major repairs, and that while there was equipment in the general vicinity, he did not have the key to the premises and, often had to gain entrance thereto by climbing over a fence. He explained that the MM-3 controller was one of four which controlled left-turn signals at the intersection, and that a malfunction in one of these instruments could cause the entire intersection to stop on whatever signal it was on at the time of its malfunction.
Alvin Krause, employed in the signal department of the Baton Rouge District of the Highway Department, testified that he received a request from the Marrero District to perform the repairs subsequent to the action taken by Potts at the intersection, after the accident on September 5. His records disclosed that the system had malfunctioning control units and repairs were not accomplished until the following day, September 6. When the repairs were made to the light after the accident, it was found that an MM-3 and a 1022 controller were faulty and both were replaced. He admitted that it was his district that usually repaired the controllers, although sometimes the Marrero District replaced them if they had controllers available.
Finally, Haberr Norckauer, an assistant traffic signal engineer for the Department of Highways, testified that a minor repair is one which can be accomplished in the field without disassembly of the traffic control device. Any repair requiring disassembly is handled by the major repair crew of the Department of Highways, but that the major repair crew does not operate on weekends and holidays.
Considering the foregoing facts we are convinced that the Highway Department was negligent in not making proper inspection and examination of the signal after the malfunction was reported on Saturday and for not taking adequate measures to correct the defect. In McDaniel v. Welsh,[5] the court reasoned that the governmental body responsible for keeping the traffic light in question in repair was negligent for permitting it to operate in an improper manner for four hours after it had constructive notice of the defect. In this case, it is apparent that the Department of Highways had four days notice, and its failure to repair the traffic light, even though the repairs had to be effected on a holiday weekend, was gross and wilful negligence.
The organ for the court in McDaniel v. Welsh,[6] rationalized as follows:
"We preface our discussion of defendant's negligence by noting that as a matter of law a high degree of care must be exacted of those whose obligation it is to maintain traffic signals. We deem this *866 rule necessary by the very nature of things. We judicially note that in municipalities, especially metropolitan areas, vehicular congestion on the public streets is constantly increasing. We deem it reasonable to conclude that increasing traffic volume poses new and added control problems to those authorities charged with the obligation of regulating automobile traffic. The greater the volume of traffic, the greater is the need for effective vehicular control, which includes properly functioning signals upon which motorists may rely with confidence.
"Here, Mr. Cranfield, who checked the light for a malfunctioning turn arrow on the morning of the accident, merely changed the entire controller. It is significant that Cranfield replaced the controller with a similar device that had been repaired by the Parish's repair department and that thereafter a different malfunction developed. After satisfying himself that this procedure corrected the precise trouble reported, he left the scene without checking the signal further. Because the new controller operated all the signals, he should have checked all the lights to determine if they were properly operative. * * * This is also attested by the fact that Cranfield was notified by City Police following the accident. That the problem encountered in the afternoon was not reported to the Parish is a matter of no consequence under the circumstances. The report to the City Police must be deemed notice to the Parish. The malfunctioning light was permitted to operate for approximately four hours after the Parish must be deemed to have notice of its improper functioning. We conclude defendant Parish was negligent in not making a proper inspection and examination of the signal after the malfunction was reported, not taking adequate measures to correct the defect, and allowing the malfunction to continue an unreasonable length of time following notice thereof. We also find its negligence was the sole cause in fact of the accident. A properly functioning traffic signal would have prevented the exact type of accident which happened."
The lower court, in its reasons for judgment, expressed the opinion that if the Department of Highways was guilty of negligence, that negligence was not a proximate cause of the accident, for the reason that the drivers of the two colliding vehicles were in themselves each guilty of negligence. We consider this conclusion negligence of the Highway Department by the lower court to be in error since the was concurrent with the negligence of the two drivers in causing the Bourgeois boy's injuries. In Vidrine v. General Fire & Casualty Company,[7] the court reasoned as follows:
"Thus, in the present instance, the failure of the municipal employees to remedy the defective traffic signal created an undue risk of harm to traffic at the intersection. The intended purpose of the duty was to prevent accidents such as that which occurred herein. The negligent failure to perform this duty was therefore a concurrent proximate cause of the accident, produced by a combination of it and of the negligence of Mrs. Vidrine in carelessly entering the intersection without adequate observation and care in the face of the out-of-order traffic signal.
"Further, the negligence of Mrs. Vidrine was not an intervening cause such as relieves the municipality of liability for its own prior negligence."
The only plausible conclusion to be drawn from a consideration of the facts inscribed in the record and the law applicable thereto is that the State of Louisiana Through its Department of Highways is *867 guilty of negligence which formed a proximate cause of the serious injury incurred by the Bourgeois lad, and which renders it liable solidarily with the other defendants. In view of our conclusion that the defendants are solidarily liable, it is obvious that the third party petition filed by United Services Automobile Association against the Department of Highways for indemnification must be dismissed.
The Bourgeois child, after the occurrence of the accident was removed to Mercy Hospital in New Orleans, and received treatment from Dr. Jose Garcia-Oller, an expert in the field of neurosurgery. Dr. Garcia-Oller in describing the child's injuries made the following statement:
"The patient was conscious. He had a frightening injury of the right side of his head. And I use this term because brain and brain fluid were seen to be visibly exposed through the wound in the right forehead."
Dr. Garcia-Oller went on to testify that brain tissue and brain fluid was extruding from the child's head, was pulsating, and was passing through two large irregular lacerations of his forehead. Physical examination revealed that the whole right side of the child's forehead and part of his temple had been flattened out and pushed inward in an inverted fashion so that it appeared that his whole right forehead had been "bashed in," with local fragmentations of the skull and wounds to the brain and all of its membranes. The doctor's preoperative diagnosis was acute head injuries with multiple contused lacerations of the right front temple and scalp with multiple depressed compound comminuted skull fractures, brain lacerations, and a brain hernia with spinal fluid fistula. The doctor explained that a brain hernia occurs whenever the brain leaves the skull cavity because of a bone defect. Since the skull had been fractured and the brain membranes lacerated, the brain herniated and was exposed under and through the child's skin. When the operation was performed, seven fragments of bone were discovered, one of which penetrated the brain tissue, causing a 1½" laceration surrounded by a blood clot.
The operation consumed five hours, at the end of which the opening in the child's head was closed by a surgical procedure described as a cranioplasty, in which an artificial bone of plastic was created and fixed in place to protect the exposed portions of the child's brain from further injury and to prevent the brain from herniating again whenever he would strain.
The doctor stated that there was brain tissue on the child's scalp when he came to the hospital, and that brain tissue of one half inch on either side of the penetrating bone fragment liquified because of the blood clot and was lost. The doctor estimated that the amount of brain loss was an area ½ deep by 1" wide.
Dr. Garcia-Oller also explained that in terms of function, the child has lost, by virtue of this injury, protection against any future brain injury which he might sustain. If the child would have a subsequent injury he would depend on the portion of the brain lost in this accident to compensate for the other loss; since the child lost a considerable volume of the right portion of the brain he would have nothing with which to compensate for loss incurred in a new injury.
The doctor also pointed out that there was extensive scarring to the child from the injury and from the somewhat unusual surgical procedure necessary to close the wound. The scar is visible over the child's forehead, which is horizontal and parallel to his eyebrow on the right side and then raises vertically towards and into the hairline. From this, a third scar travels toward *868 the cheekbone just inside the hairline. It was explained that the reason for some of this extensive scarring was the necessity for a plastic closure of the wound. Dr. Garcia-Oller asserted that the wound was so extensive and the scalp was so damaged that it was necessary to make an additional incision into the temple and to move the scalp forward towards the child's forehead so that he could close the damaged scalp. He then had to move some of the scalp tissues into the brain membranes which had been destroyed in order to create an artificial brain membrane for the child.
The doctor stated that the child would likely have seizures or convulsions at any time in the future because scar tissue from lacerated brain tissue and destroyed brain membrane is apt to cause convulsions even years after such injury. He further expounded on functional disability by reiterating the child's predisposition to post-traumatic epilepsy and stated that in terms of brain function an alteration of personality would occur which he estimated to be at 10% of the function of the frontal lobe on the right side. However, the doctor emphasized that because of the child's age it was difficult to evaluate his percentage of disability and it may take a number of years before the child's loss of creativity and excessive passive behavior would become apparent. He was quite positive in his testimony that the child would be physically limited from contact sports and from any heavy work activities. In addition, the child suffered cosmetic defects as a result of the injuries. The doctor related that the injury was caused by a foreign body, apparently a knob from the door or dashboard of the automobile, being driven through the child's skull into the brain. This extraordinary injury necessitated the use of a plastic insert as hereinabove described. The plastic insert caused a bulge the size of an egg over the child's right eye in the area of his forehead, and apparently would continue to do so until the child was old enough, and his skull was thick enough, to accommodate a permanent high impact plate. In the meantime, however, the boy would have to go through his childhood with the disfiguring scars and the disfiguring lump over his eye. It should also be noted that there was occasional swelling in the area of the plastic plate caused by accumulation of fluid under the scalp when the artificial bone plate was accidentally struck. This accumulation of fluid occurred at least three times, and apparently will be subject to reoccurrence until the child's future operation has been performed and a permanent skull plate is inserted.
The assessment of damages in the case of a brain injury to a child of tender years is most difficult, since the ultimate effect of the injuries will not become apparent until some time in the distant future. In this case it is obvious, we believe, that the lower court rendered judgment in the amount of $35,000.00 solely because this sum represented the total amount of coverage under the various insurance policies involved. A similar situation developed in the case of Debautte v. Southern Farm Bureau Casualty Insurance Company,[8] where an adult sustained what is described as a brain injury far less severe than that incurred by the child in this case. This court raised the judgment from $35,000.00 to $100,000.00 with the added notation that the judgment would probably be raised to $150,000.00, except for the fact that the judgment was far in excess of the insurance policies and that the individual defendants would have to pay the surplus. It is interesting to note that the plaintiff in the Debautte case suffered injuries roughly similar to those incurred by the child in this case, with the exception that he was not subject to epileptic seizures. On the other hand, plaintiff in that case was gainfully employed at the time of his injury, and lost wages formed part of the court's basis for computation of damages. A difficult situation presented here is the fact that the *869 child is far too young to work and any estimate of his potential lost wages would be mere conjecture on our part. However, in Jones v. Aetna Casualty & Surety Company,[9] $50,000.00 was awarded to a 61 year old woman who sustained injuries to her face in an automobile accident, was in shock from blood loss, and underwent surgery lasting two hours and forty-five minutes. This plaintiff was thereafter unable to control salivation and could not register an expression on one side of her face. While the injuries in the present case are more severe than those sustained by the plaintiff in the Jones case, the two cases point to the common factor that neither plaintiffs were gainfully employed and lost wages did not play a part in their recovery.
From a review of these and other pertinent cases appearing in the jurisprudence we are convinced that the Bourgeois child's injuries were so severe that the award of $35,000.00 is grossly inadequate. We award the sum of $75,000.00, with the hope that this award is sufficient to compensate the child both for the injuries which are known and for those future injuries which may manifest themselves as he matures.
For the foregoing reasons, the judgment of the trial court is amended by including as a judgment debtor the State of Louisiana Through the Department of Highways and the total sum awarded is hereby raised from $35,000.00 to $75,000.00. It is further decreed that all defendants are cast in solido, with the exception that the respective defendant insurers are solidarily liable only up to the amount of their respective policy limits. As amended, the judgment of the lower court is affirmed.
All defendants are to bear the costs of this proceeding in equal portions.
Amended and affirmed.
NOTES
[1] It was stipulated that Hanover's policy was excess over that of United Services Automobile Association.
[2] See Jordan v. Great American Insurance Company, La.App., 248 So.2d 363 (1971).
[3] 168 So.2d 449 (3rd Cir., La.App., 1964).
[4] This accident occurred at 7:15 P.M. on the day before the Bourgeois accident, and the State Trooper who investigated the collision testified that he, too, notified the State Highway Department.
[5] La.App., 234 So.2d 833 (1970).
[6] 234 So.2d 833, supra.
[7] 168 So.2d 449 (3rd Cir. 1964).
[8] 170 So.2d 234 (4th Cir., La.App., 1964).
[9] La.App., 198 So.2d 523 (1967).