CURRAULT, Judge.
This appeal is from the Twenty-Fourth Judicial District Court, Division “L”, wherein trial was conducted on six consolidated cases all arising out of the same vehicular collision which occurred at the intersection of U.S. Highway 90-B (Westbank Expressway) and Terry Parkway. Made defendants herein were the drivers of the involved vehicles, Elijah Carr and Anthony Buckley, Westchester Fire Insurance Company and Dairyland Insurance Company of Illinois, their insurers respectively, and the State of Louisiana through the Department of Highways (now the Department of Transportation and Development, hereinafter “DOTD”).
By stipulation, it was agreed that the trial would be divided into liability and quantum.[1] After a protracted trial on the liability portion, the trial judge, Honorable Lionel R. Collins, rendered judgment holding both drivers, Carr and Buckley, to be the sole and proximate cause of the collision and dismissed DOTD finding that they were not in any way negligent in causing the accident. From that judgment, various parties have perfected this appeal. We reverse in part and affirm in part.
At the time of the accident, the West-bank Expressway was a four lane highway running east and west and divided by a thirty-eight foot (38') wide median. Running parallel on the north and south of the Expressway was a two-lane service road. Terry Parkway, a divided four-lane street running north and south, intersected with both the service road and the Expressway. *479 The intersection of the service road and Terry Parkway was governed by stop signs and the main intersection of Terry Parkway and the Expressway was controlled by electric semaphore lights.
The intersection was constructed so that there was a left turn bay for westbound Expressway traffic. The median narrowed to twenty-eight feet (28') to accommodate the left turn bay which had a turning lane ten feet (10') wide and two hundred feet (200') deep. Traffic utilizing this turning bay would be turning left from the westbound side of the Expressway onto Terry Parkway South. See Appendix 1.
Under normal signal light operations, the traffic in the left turn bay would not be allowed to turn left until Terry Parkway traffic crossing the Expressway was stopped. The traffic on Terry Parkway proceeding north across the Expressway was prevented from stopping in the median and blocking the left turn lane by a signal light. If, however, such a crossing vehicle did become stopped and blocked the left turn traffic, it was not allowed to proceed across the westbound lanes of the Expressway until westbound traffic was also stopped. This allowed the crossing vehicles to proceed across the westbound lanes of the Expressway safely on a green light, even though the vision of this driver might have been obscured by traffic which he had blocked in the left turn bay to his right.
However, with the lights in the flashing mode, an otherwise controlled intersection would present an entirely different situation. The northbound motorist on Terry Parkway would be required to cross the eastbound lanes of the Expressway and then stop in the median area directly in front of the left turn bay. If the left turn bay was not already congested with vehicles, it soon would be, since the northbound motorist would be blocking that lane. The blocked left turn bay would present an obstruction to both the northbound motorist’s view of oncoming Westbank Expressway traffic approaching from his right and the westbound Expressway motorist’s view of any vehicles to their left. The result of a stacked left turn lane was a blind intersection that has been characterized as a “trap” for motorists crossing through the intersection on Terry Parkway or approaching the intersection westbound on the expressway.
On July 20, 1976, the electric semaphore lights which controlled traffic at Terry Parkway and the Westbank Expressway were not functioning properly and had been placed in the flashing mode by DOTD. Both drivers were aware of this condition as each had passed through the intersection earlier that day.
Elijah Carr, prior to entering the intersection, had been traveling north on Terry Parkway. Anthony Buckley, traveling west on the Expressway, approached the intersection from the Greater New Orleans bridge. Since a line of cars occupied the westbound left turn bay of the Expressway, each driver’s view of the other was obscured. The drivers did not see each other until both were in the intersection. Impact occurred instantaneously.
The sole question before us now is whether the trial judge was clearly wrong (manifestly erroneous) in concluding that DOTD was free of any negligence in causing this accident and that the sole and proximate cause was the negligence of Carr and Buckley. In resolving this question, we conclude the trial court was manifestly erroneous in dismissing DOTD, concluding that they were free of any negligence but agree with the finding that Carr and Buckley were negligent.
NEGLIGENCE OF DOTD
The functions and duties of the Department are defined in LSA-R.S. 48:21(A), which provides in pertinent part:
The functions of the department shall be to study, administer, construct, improve, maintain, repair and regulate the use of public transportation systems and to perform such other functions with regard to public highways, roads, and other transportation related facilities as may be conferred on the department by applicable law.
*480 In LaCour v. State Farm Insurance Company, 417 So.2d 85, 88 (La.App. 3d Cir.1982), the issue of the liability of DOTD was discussed as follows:
The Department of Highways is not responsible for every accident which occurs on state highways. It is not a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from defects in the highways. The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonably prudence (sic). It is liable for damages only when the evidence shows (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver, and (2) that the department had notice, either actual or constructive, of the existence of the defect and failed within a reasonable time to correct it. (Citations omitted)
In requiring that state highways be reasonably safe for persons exercising ordinary care and reasonable prudence, the courts of this State have imposed the following duties:
(1) It is the duty of DOTD to notify local police authorities of a malfunctioning traffic signal at an intersection in order that traffic be manually directed until repairs can be made. Hardy v. State, through Dept. of Highways, 404 So.2d 981 (La.App. 3d Cir.1981); Gaspard v. Stutes, 380 So.2d 201 (La.App. 3d Cir.1980); Lochbaum v. Bowman, 353 So.2d 379 (La.App. 4th Cir. 1978);
(2) It is the duty of DOTD to erect barricades, signs and adequate markings to warn against extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions or defects in the road. Hardy v. State, through Dept. of Highways, supra; Ardoin v. State Department of Highways, 333 So.2d 412 (La.App. 3d Cir.1976); and
(3) It is the duty of DOTD to properly maintain, repair and correct malfunctioning traffic signals after receiving adequate notice. Chesson v. American Hardware Mutual Ins. Co., 412 So.2d 186 (La.App. 3d Cir.1982); Hardy v. State, through Dept. of Highways, supra; Bourgeois v. State, through Dept. of Highways, 255 So.2d 861 (La.App. 4th Cir.1972).
In dismissing DOTD, the trial court concluded,
“In regards to the claim against the DOTD, the evidence showed that on the morning of the accident, the traffic control system was malfunctioning and a transformer in the control unit had to be replaced. The DOTD did not have a back-up system and in order to fix the unit it had to be shipped to Baton Rouge to be repaired.... In this particular case, the DOTD responded promptly and took corrective measures to remedy the problem.
The Court is of the opinion that the DOTD did everything that was necessary to correct the malfunction of the traffic control system. The DOTD, responded timely to the malfunctioning system and put into operation an alternate traffic control system, i.e., the flashing light system. ...”
While we concur that DOTD was prompt in their response time, we disagree that DOTD did everything necessary by taking the proper corrective measures to remedy the problem. DOTD’s conduct fell far short of that high degree of care a governmental authority must exercise when undertaking the control of traffic at intersections. Gaspard v. Stutes, supra.
It is evident that for over two months prior to the accident, DOTD was aware that the intersection of Terry Parkway and U.S. Highway 90-B (Expressway) presented an almost continuous maintenance problem. Beginning on May 3, 1976, and running through to July 20, 1976, the date of the accident, DOTD received approximately 38 complaints concerning the signals at Terry Parkway and the Expressway.
*481 The record indicates that DOTD received complaints and serviced this intersection almost daily during the week immediately preceding the accident. On July 12, 1976, DOTD dispatched a repair crew in response to a complaint lodged at 6:20 p.m. The work order stated the lights were placed on flashing. On July 13, 1976, a work crew responded to a complaint filed by the sheriff’s office at 6:14 a.m. The work order stated repairs accomplished and the lights were taken off flash at 11:15 a.m. On July 14,1976, a DOTD work crew again responded to a complaint that all signals were out. Repairs were made and the lights were put back into service at 11:30 a.m. On July 15, 1976, two complaints were received at 5:30 p.m. and 10:18 p.m. respectively and the work orders indicate the necessary repairs had been made. On Friday, July 16,1976, a work crew was again dispatched and repaired these signals.
The record does not contain any complaints for July 17 and 18, as these days fell on a weekend. However, the complaints resumed on Monday, July 19, 1976, the day before the accident, when DOTD was alerted at 5:06 p.m. that all signals were out at U.S. 90-B and Terry Parkway. Later Monday night at 7:56 p.m., DOTD received a second complaint that the lights were malfunctioning. The work order stated that the trouble could not be found and that the signals were placed in the flashing mode.
On Tuesday, July 20, 1976, the day of the accident, DOTD acted on a complaint received at 8:00 a.m. Work was completed and the lights were taken off the flashing mode at 8:40 a.m. A second complaint was received at 1:00 p.m. However, the work order indicates the trouble could not be found and the crew left at 2:00 p.m., leaving the signals on flash. The accident then occurred at 6:40 p.m. that afternoon. Later, at 8:40 p.m. that evening, DOTD responded to a third complaint lodged earlier at 8:00 p.m. The work crew departed at 10:45 p.m. The work order noted that the signal was not operating on arrival or departure and that the M-30 controller was brought to the shop for repairs. Finally, two days later on July 22, 1976, the M-30 controller was replaced with a new one from Baton Rouge.
The trial court concluded that the decision to pull and replace the controller unit was made on the morning of the accident. That conclusion is clearly wrong as the facts bear out that the decision to pull and replace the controller was not made until the night of July 20, 1979, several hours after the accident had already occurred.
In addition to these complaints, State Police Officer Jerry Burg, testifying from the desklog of the State Police office, stated that during the same two-month period the State Police investigated nineteen (19) accidents at Terry Parkway and U.S. Highway 90-B.[2] Officer Burg further testified that on July 19, 1976, just one day prior to the accident, State Trooper Michael Richard investigated two accidents at Terry Parkway and U.S. Highway 90-B. Trooper Richard was the investigating officer of both the accidents occurring on July 19, 1976, and the one before us occurring on July 20, 1976. Although Trooper Richard could not recall if the lights were malfunctioning on July 19, 1976, he reported the light as malfunctioning to the desk sergeant on July 20, 1976, thereby accounting for the log entry reflecting the call to DOTD’s district maintenance engineer, Mr. Nathan Childs, informing him about the signal being out for three days.
Mr. Boyd Gautreaux, employed by DOTD as district traffic engineer on July 20, 1976, was in charge of traffic operations in the district. His duties did not include signal maintenance as that was the responsibility of the district maintenance engineer, Mr. Nathan Childs, but he did testify he had received thirty-three (33) complaints rela *482 tive to the intersection in question and had passed them on to the district maintenance engineer. Gautreaux indicated that the system at Terry Parkway was a more involved system because it involved a special timer that accordingly had more parts to have problems with. However, despite continuing problems with this intersection and this particular controller, DOTD, for reasons not clear, did not stock the controller. In fact, the record indicates that as early as June 4, 1976, the controller could not be repaired because there were no spare parts. Rather, the entire unit had to be sent to Baton Rouge for rebuilding. DOTD records indicate that at no time prior to the accident did they consider replacing the controller or requesting a spare controller from Baton Rouge.
Mr. Gautreaux knew of no guidelines, manual or policy governing DOTD’s procedures for investigating or dealing with a situation such as the one that existed at Terry Parkway and the Expressway on July 20, 1976, even though the decision to use manual controls in the event of a breakdown was within his authority. Gautreaux testified that although DOTD was aware that the design capacity of this intersection would be exceeded at peak hours, the decision to employ traffic controls in the event of signal failure would be strictly a judgment call. He further testified that DOTD was also aware that when a signal system was placed in the flashing mode, the accident rate would increase and in particular right , angle collisions.
Mr. Nathan Childs, Jr., employed by DOTD as maintenance engineer, was head of maintenance for all departments. However, the responsibility of traffic signal maintenance was delegated to Mr. Sapia who had the sole authority to decide whether a controller should be repaired, replaced or whether other protective systems should be employed. Mr. Childs also testified he was not aware of any guidelines, written policies or procedures to be followed in regard to traffic signal maintenance. Childs did admit though that having the alternative flashing system on was not the ultimate in safeness, but was only a little better than not having the signals working at all.
Dwayne Evans, qualified and accepted as an expert in traffic engineering and maintenance, testified that while employed with DOTD in Baton Rouge, they had the capability of replacing any traffic controller in their jurisdiction within a couple of hours. Evans felt that the number of problems DOTD had with this particular controller was unusual and that from the nature of those problems DOTD should have been prepared for this controller’s eventual dysfunction. He further pointed out that in his experience as traffic engineer in Baton Rouge, it was their procedure to have a readily available supply of replacement controllers that could replace any controller in the field so that the signals could be kept operating if at all possible.
Dr. Evans further testified that when the left turn lane was congested and a vehicle was occupying the median area directly in front of the left turn lane, this created a “trap” situation. Dr. Ned Walton, an expert in traffic maintenance, highway design and traffic engineering called by DOTD, characterized a vehicle caught in the median as one in “a very tough situation.” Both experts agreed that this situation could have been easily prevented by simply placing barricades in the left turn lane and preventing left turns at the intersection while the lights were flashing or by having police direct traffic.
We find the language provided by the court in McDaniel v. Welsh, 234 So.2d 833, 840 (La.App. 1st Cir.1970), to be appropriate:
We preface our discussion of defendant’s negligence by noting that as a matter of law a high degree of care must be exacted of those whose obligation it is to maintain traffic signals. We deem this rule necessary by the very nature of things. We judicially note that in munic *483 ipalities, especially metropolitan areas, vehicular congestion on the public streets is constantly increasing. We deem it reasonable to conclude that increasing traffic volume poses new and added control problems to those authorities charged with the obligation of regulating automobile traffic. The greater the volume of traffic, the greater is the need for effective vehicular control, which includes properly functioning signals upon which motorists may rely with confidence.
Under the circumstances of this ease, it is clear that the signal light problem was a contributing cause of the accident. The Department had the legal duty of properly maintaining, inspecting and replacing the malfunctioning controller at this intersection. The Department violated the high degree of care owed to the motoring public by allowing the chronic malfunctioning of this signal to persist for over two months. They failed to order and have in stock either the parts for or another controller of the type used at Terry Parkway and U.S. 90-B, despite numerous complaints and visits to the site. The risk of such an accident was certainly within the ambit of this duty, i.e., it was foreseeable that such an accident could occur at a heavily traveled intersection such as Terry Parkway and U.S. 90-B when the signals are in the flashing mode. We find this especially true when officials of DOTD admit they were aware that the limits of this intersection were exceeded during peak rush hours and that the incident rate of right angle accidents would increase. DOTD breached its duty to properly maintain, repair and correct the malfunctioning traffic signals at the intersection after receiving adequate notice.
Furthermore, DOTD was negligent in that they breached their duties when they failed to alert the proper police authorities so that traffic could be controlled and manually directed until repairs could be made; and that they failed to properly warn motorists of an uncontrolled trap-like hazardous intersection by erecting barricades, signs or other adequate markings. Mr. Childs admitted that this intersection is now blocked by barricades when the light malfunctions because of the high volume of traffic. Boyd Gautreaux supported Mr. Childs’ statement adding that the barricades are employed to prevent vehicles from crossing the Westbank Expressway on Terry Parkway and also to prevent left turns from the Expressway onto Terry Parkway.
Accordingly, we hold the trial court was clearly wrong in dismissing DOTD on a finding that they were in no way negligent in their handling of this matter. That portion of the judgment dismissing DOTD is reversed.
NEGLIGENCE OF ELIJAH CARR
Elijah Carr testified that he was familiar with the intersection of Terry Parkway and U.S. 90-B because he traveled that route every day to and from work, twice a day. He also admitted that he was aware that the lights were “flashing” for at least a week prior to the accident. On the morning of the accident, he stated that the lights were flashing red for Terry Parkway and yellow for U.S. 90-B. However, his testimony was that the lights were flashing yellow for Terry Parkway that evening pri- or to the accident. He testified that he stopped three times while proceeding north on Terry Parkway, once at the service road in obedience to a stop sign, at the eastbound lanes of 90-B, and finally in the median area adjacent to the westbound lanes of 90-B. He stated that there was a line of cars to his right in the left turn holding lane of the Expressway and was an obstruction to his view. As to the exact extent of his vision, Mr. Carr was contradictory and vague, ranging from two ear lengths to half a block.
Rather than pulling up further and stopping again with the front of his vehicle even with the fronts of the vehicles in the left turn holding lane on the Expressway, Mr. Carr simply pulled off.
*484 Mr. Benny Beauregard, an independent eyewitness, stated that he was approximately two cars back in the left turn holding lane when the accident occurred. It was his testimony that the impact occurred in the left lane of the Westbank Expressway and that although Mr. Carr’s vehicle was pulling out at a slow rate of speed, it did not stop prior to impact and suddenly accelerated prior to impact.
Leo Brady, a passenger in the Carr vehicle, testified that Carr stopped a total of three times and that the light was flashing yellow in their direction. However, nowhere does Mr. Brady indicate that after stopping the third time in the median for westbound traffic did Mr. Carr come to additional stops after inching forward or aligning the front of his vehicle with those in the left turn holding lane of the Expressway. In fact, Mr. Brady, on cross examination, was uncertain as to whether and where Mr. Carr stopped for the third time.
The trial judge found as a matter of fact that Mr. Carr was faced with a red flashing light and had violated his duty to obey that light in attempting to cross the Expressway. Thus, Elijah Carr was held to be negligent. We agree and cannot find manifest error. The trial court concluded that Mr. Carr was faced with a red flashing signal; however, even if we were to hold Mr. Carr was only faced with a yellow flashing light, we would still reach the same conclusion since we believe his conduct violates the duty of a motorist presented with a yellow caution signal.[3]
NEGLIGENCE OF ANTHONY BUCKLEY
Anthony Buckley was proceeding westbound on 90-B in the left lane at the time of the accident. He testified that there was a blinking yellow light in his direction but did not observe the lights facing Terry Parkway. He was familiar with the intersection since he had traveled it earlier that day and described it as dangerous. He testified that there were approximately nine vehicles to his left in the left-turn holding lane of the Expressway and that he could not see Mr. Carr’s vehicle prior to impact because of those cars. He stated that he was traveling 40 m.p.h. when he first came off the bridge but that when he saw the yellow blinking caution light, he slowed to approximately 33 to 35 m.p.h. Buckley testified that he did not see the Carr vehicle until he was approximately two car lengths away.
The trial judge held Mr. Buckley eontrib-utorily negligent for traveling too fast on his approach to this intersection in light of the surrounding circumstances. We concur with this holding and believe Mr. Buckley was negligent in that his excessive speed under the prevailing traffic conditions was a cause of the accident. McIntyre v. Government Employees Insurance Company, 413 So.2d 174 (La.App. 4th Cir.1982); Insured Lloyds v. Liberty Mutual Insurance Company, 286 So.2d 420 (La.App. 1st Cir. 1974).
Therefore, for the above stated reasons, the judgment of the district court dismissing the State of Louisiana, through DOTD is reversed with a finding of negligence on their part; otherwise the judgment holding Elijah Carr and Anthony Buckley negligent is affirmed. Additionally, we find the negligence of these defendants to be concurrent. Each appellant to bear his own costs.
REVERSED IN PART; AFFIRMED IN PART.
*485 APPENDIX 1

. LSA-C.C.P. art. 466. Separate trials of issues of liability and damages
A. When the court is of the opinion that it would simplify the proceedings, would permit a more orderly disposition of the case, or otherwise would be in the interest of justice, then at any time prior to trial it may order, with consent of all counsel, separate trials on the issues of liability and of damages, whether or not there is to be a jury trial on either issue....
C. A judgment rendered on the issue of liability, when signed by the judge as provided by Article 1911, shall be a final, appealable judgment. Added by Acts 1980, No. 598, § 1.

. These nineteen accidents investigated by the State Police reflect accidents handled solely by the State Police and do not account for possible additional accidents handled by either parish or local police authorities.

. The duty of a motorist presented with a yellow caution signal is set forth in LSA-R.S. 32:234(A)(2), which provides in pertinent part:
“FLASHING YELLOW OR AMBER (CAUTION SIGNAL) When a yellow lens is illuminated with rapid intermittent flashes, drivers of vehicles may proceed through or past such signal only with caution.”