Lillie Mae LeBOUEF Leleux Duhon et al.

v.

The GOODYEAR TIRE & RUBBER COMPANY et al.

Floyd DUGAS

v.

The GOODYEAR TIRE & RUBBER COMPANY et al.

Civ. A. Nos. 76–1191, 76–1323.

United States District Court, W. D. Louisiana, Lafayette Division.

May 10, 1978.

---

Nolan J. Edwards, Crowley, La., Sue Fontenot, Abbeville, La., for plaintiffs.

L. H. Olivier, Lafayette, La., for Goodyear.

James E. Diaz, Lafayette, La., for Ford.

## MEMORANDUM OPINION

W. EUGENE DAVIS, District Judge.

Mrs. Lillie Duhon brought Action No. 76–1191 against Ford Motor Corporation (Ford) and Goodyear Tire & Rubber Company (Goodyear) for the wrongful death of her son, Shelby Leleux, who was killed when his car left the roadway and struck a culvert. This action was consolidated with Civil Action No. 76–1323 brought against the same defendants by Floyd Dugas, a passenger in the car, for personal injuries sustained in the same accident.

The accident occurred when the tread on the left rear tire of the Leleux vehicle separated from the carcass of the tire and allegedly caused the vehicle to pull to the left and leave the roadway.

## I. LIABILITY

### A. *Facts*

In January, 1976, Shelby Leleux purchased a new 1976 Mercury Cougar, Series XR–07, equipped with a 460 cubic inch engine. When the vehicle was sold by Ford, it was equipped with HR78–15 Goodyear custom power radial tires, which were standard equipment for the Mercury Cougar.

After the car had been driven 1342 miles, the left rear and right front tires developed a low speed wobble. Leleux drove the car to the Goodyear dealer in Crowley and arranged to have the dealer replace the tires that were functioning improperly. This was accomplished by moving the left front tire to the left rear wheel and installing the two replacement tires on the front wheels of the car.[1]

On June 6, 1976, at approximately 5:00 a. m., Leleux and Dugas left Kaplan, Louisiana, for a dance in Riceville, Louisiana. Leleux was driving the Mercury Cougar and Dugas was a passenger in the automobile. Both men had been visiting and drinking in several bars in the area since 9:00 p. m.

The paved highway from Kaplan to Riceville is a two-lane, relatively straight road. Approximately one mile beyond the city

---

[1]. There was conflicting evidence on this point. Mr. Duhon, plaintiff's stepfather, testified that Shelby Leleux pointed to his left rear tire and said that it had been replaced. Mr. Albert Thibodeaux, service manager for the Goodyear dealer in Crowley, testified that he witnessed the installation of the left front original equipment tire on the rear and the two replacement tires on the front. In view of Thibodeaux' firsthand knowledge of the placement of the tires, I accept his version.

limits of Kaplan, Shelby Leleux accelerated the speed of the vehicle to at least 100 miles per hour.[2]

Approximately 10 miles from Kaplan, or less than six minutes later, Dugas heard a small explosion, followed by a thumping sound, which seemed to emanate from the left rear of the car. The car pulled to the left side of the road and remained on the pavement for approximately 219 feet before it faded to the gravel shoulder. Leleux was able to hold the car on the shoulder for some 67 feet before the car jumped the four-foot drop from the roadbed to the field below. From this point, the car travelled 225 feet, struck a culvert and came to rest a short distance from the culvert.

Leleux was killed instantly; Dugas suffered serious injuries. A blood alcohol test was conducted which revealed that Leleux' blood contained .18% alcohol.

Examination of the left rear tire after the accident revealed that the tread of the tire had separated from the carcass. Experts consulted by both sides agreed that neither road hazards nor neglected cuts in the tread of the tire caused the tire failure.

The Goodyear "polysteel" radial tire in question had been driven 4867 miles at the time of the accident. The carcass of the tire was wrapped with two polyester belts and reinforced by steel bands which ran circumferentially around the tire. These two belts served as constricting members for the carcass of the tire and were overlaid by the tread.

Mr. George Pappas, a registered chemical engineer, was called as an expert by plaintiff. He had examined automobile tires that failed under similar circumstances five or six times in the year preceding this examination. He conducted a visual and microscopic examination of the tire and concluded that the failure of the tire resulted from inadequate bonding of the tread to the carcass of the tire. Pappas testified that with this defect the tire could have failed at any speed greater than 50 miles per hour.

Mr. Lou Davis of Goodyear found no defect in the original construction of the tire. He discounted the possibility of incomplete vulcanization because such a condition would leave a spongy appearance to the rubber and no such appearance was detected. He testified that the adhesion appeared sound because no polishing of the laminated surfaces was present.

Mr. Davis was of the opinion that the tire had retained air after the tread separated from the carcass. He reasoned that had the carcass deflated when the tread separated, the wheel would have scraped the pavement and picked up traces of asphalt. He found no asphalt on the wheel. He theorized that when the Cougar plunged from the roadbed the tire burst because the naked carcass had insufficient strength to support the weight of the car.

Mr. Davis testified that the Department of Transportation requires manufacturers to test their tires by running them for 30 minutes at speeds of 50, 70 and 85 miles per hour. According to Davis, the Department of Transportation does not require testing above 85 miles per hour. Further testing is performed by Goodyear which consists of running randomly selected tires for 30 minutes at 95 and 100 miles per hour. He estimated that about 10% of the tires subjected to such tests by Goodyear do not survive the 100 miles per hour test.

It is clear from the evidence that the Goodyear tire was designed for a maximum safe operating speed of 85 miles per hour. Except for this design limitation in the tires, the Mercury Cougar was designed for a maximum operating capability of speed in excess of 100 miles per hour.

2. The speedometer of the Cougar automobile registers a maximum of 140 miles per hour. In his deposition, Floyd Dugas testified at one point that the needle was "buried." At another point in his testimony, Floyd Dugas stated that he did not know what speed the speedometer indicated but that it was over 100 miles per hour. Mr. Valant, the Ford representative, testified that the vehicle was capable of a speed of 100 to 105 miles per hour. I find that the speed of the Leleux vehicle at the time of the accident was somewhere between 100 and 105 miles per hour.

Both Davis and Patrick Valant testified that Ford was privy to the design capabilities of the Goodyear tires. Goodyear did not convey this information to ultimate users of their tires. The only relevant warning given by Ford, in this connection, is the following phrase in its owners' manual:

" . . . Continuous driving over 90 mph requires using high-speed-capability tires."

### B. *Liability of Defendants*

Plaintiff failed to establish that the tire was defective by reason of improper construction or fabrication. The testimony of Mr. Pappas, plaintiff's expert, did not convince me that the tire was constructed and fabricated in a manner that differed from the method of construction chosen by the manufacturer.

The question for decision narrows to whether the tire and the Mercury Cougar automobile on which the tire was mounted were defective by virtue of the design of the Goodyear tire.

■ Under Louisiana law, a product is considered defective if, because of design or construction, it is unreasonably dangerous for normal use.[3]

■ The instructions and warnings given by a manufacturer with respect to the operating capabilities and limitations of its products are a significant part of the overall design of the product.[4] The brief cautionary language in the Mercury operator's manual suggesting the need for spe-

cially designed tires "for continuous driving over 90 miles per hour" was inadequate to place the owner or operator of a vehicle on notice of the hazard he could expect to encounter at advanced operating speeds.[5] This is particularly true here where the high speed was maintained no longer than 6–8 minutes.

The primary defense urged by the defendants is that this vehicle was not in "normal use" at the time of the accident.

■ We agree that the operation of a vehicle in excess of 100 miles per hour is not normal in the sense that it is not routine. Normal use, however, when used in this context, takes on a special meaning that is synonymous with "foreseeable" use. In *Jones v. Menard*,[6] the Court noted:

"In inadequate warning cases misuse means that the seller had no duty to warn against unforeseeable uses of its products, while in design cases misuse means that the manufacturer had no duty to design a product so as to prevent injuries arising from unforeseeable uses of that product."[7]

■ I conclude that the Goodyear tire and the Mercury automobile on which the tire was mounted were unreasonably dangerous for normal use.

The Cougar automobile was equipped with a 425 horsepower engine when it left the factory and had the capability of travelling at speeds in excess of 100 miles per hour. Goodyear either had actual or constructive knowledge of the fact that its

---

3. *Weber v. Fidelity & Casualty Insurance Co.*, 259 La. 599, 250 So.2d 754 (1971) and *Dixon v. Gutnecht*, 339 So.2d 1285 (La.App. 1st Cir. 1976).

4. *§ 402 A, Restatement of Torts 2d, Comment J.*

5. *See American Guaranty & Liability Insurance Co. v. Little*, 328 So.2d 706 (La.App. 3rd Cir. 1976).

6. 559 F.2d 1282, 1285 (5th Cir. 1977).

7. *See also Rey v. Cuccia*, 298 So.2d 840 (La. 1974) and *§ 395 Restatement of Torts 2d.* Comment (j) provides in part as follows:

"*j. Unforeseeable use or manner of use.* The liability stated in this Section is limited to persons who are endangered and the risks which are created in the course of uses of the chattel which the manufacturer should reasonably anticipate. In the absence of special reason to expect otherwise, the maker is entitled to assume that his product will be put to a normal use, for which the product is intended or appropriate; and he is not subject to liability when it is safe for all such uses, and harm results only because it is mishandled in a way which he has no reason to expect, or is used in some unusual and unforeseeable manner . . . "

tires would be placed on vehicles with speed capabilities above 85 miles per hour. Ford should have foreseen that a significant number of ultimate users of its products would drive their vehicles. at top speed. This is particularly true of a sport model automobile such as a Cougar with wide appeal to youthful drivers.

■ Because the tire in question was actually manufactured by Goodyear and in fact bore the Goodyear trade name, Ford argues that it should not be cast in judgment for a defective tire.

Although Ford did not manufacture the tire, it did manufacture the Cougar by gathering suitable components to be assembled as a finished product. In *Spillers v. Montgomery Ward & Co.,* 294 So.2d 803 (La.1974), the Louisiana Supreme Court discussed the standard to be applied to one in Ford's position:

> "The fact that G & S did not actually manufacture the wheel and the rim is of no consequence. G & S was a manufacturer . . . a manufacturer is no less a manufacturer because his product is composed in part of units manufactured by another."

The Fifth Circuit expressed the rationale behind this species of liability in *Ford Motor Company v. Mathis,* 322 F.2d 267 (1963):

> "Though discerning industrialists or students of our economy should know that in each car as it rolls off the assembly line there is represented countless man hours of labor by workers scattered throughout hundreds of plants independently owned and operated, not even these sophisticated 'men of distinction' would suppose that they were bargaining for a mobile assortment of nuts, bolts and moving parts which if well greased, coaxed and fueled would act like an automobile. The purchaser of a new automobile is led by the manufacturer-assembler to think that the car is a quality product. In effect, the purchaser does not distinguish between the assembler and the manufacturer. Nor does the manufacturer-assembler

wish him to do so. Although he may realize that the assembler actually does not design and manufacture every component part, the purchaser assumes that the manufacturer-assembler will procure non-defective parts from reputable firms without the ultimate customer having to ascertain the manufacturer of each part."

Ford, in its assembly of the Mercury Cougar, chose a tire that was unreasonably dangerous for normal use.

Ford, as assembler, was aware of both the design limitations of the tire and the speed capability of the automobile.

Under these circumstances, I conclude that Ford may not avoid liability for the defective automobile on grounds that it did not manufacture the tire.

## II. CONTRIBUTORY NEGLIGENCE AND ASSUMPTION OF RISK

■ I find that Shelby Leleux was negligent in operating his vehicle at an excessive speed on a two-lane highway at night and that the excessive speed was a contributing cause of the accident.

The defendants failed to establish that the intoxication of Leleux was a cause in fact of the accident. Mr. Charles Gold testified that the sudden separation of the tread from the carcass of the tire should not have caused significant handling problems for a sober operator. I am unable to accept Mr. Gold's opinion that the steering problem under these circumstances would have been minimal.

As I reconstruct the testimony, the vehicle left the roadway and the tire blew out within 2–3 seconds after the tread separated from the carcass.[8] After the tread separated, the unprotected carcass was in imminent danger of bursting at any time, whether it was on the roadway or not. Even if Mr. Gold's testimony is accepted, there is no basis on which to speculate as to when, even if the car had remained on the highway, the tire would have burst and

8. The vehicle travelled approximately 286 feet from the point where the tread separated to the point where the vehicle left the shoulder of the roadway.

caused the driver to lose control of the vehicle. I conclude, therefore, that defendants failed to establish that Leleux' intoxication was a cause in fact of the accident.

■ I reject the affirmative defense of assumption of risk asserted by defendants in defense of both actions.[9]

■ In *Hastings v. DisTran Products, Inc.*, 389 F.Supp. 1352 (W.D.La.1975), Judge Hunter of this Court carefully analyzed the Louisiana authorities with respect to whether contributory negligence on the part of the plaintiff would bar his claim against the manufacturer for injuries resulting from a defective product. Based upon the reasoning of Judge Hunter in *Hastings* and the opinion of the Fifth Circuit in *Khoder v. AMF, Inc.*,[10] I conclude that the contributory negligence of Shelby Leleux will not bar the recovery of his survivor.

## III. DAMAGES

### A. *Mrs. Lillie Duhon*

■ Shelby Leleux was the 25-year old unmarried son of Mrs. Lillie Duhon by a previous marriage. Shelby was her only son and lived with plaintiff and her husband, Mr. Duhon, at the time of the accident. Mrs. Duhon was not dependent upon Shelby for support. Except for funeral expenses of $1,925.00, plaintiff's claim is limited to one for loss of love and affection.

Mrs. Duhon has two other children, a married daughter and a 20-year old retarded daughter. Mrs. Duhon testified to her close relationship with her son, Shelby, which testimony I accept.

The following award will be made in favor of Mrs. Duhon:

1) Loss of love and affection _____$35,000.00
2) Funeral expenses _____$ 1,925.00
   TOTAL _____$36,925.00

### B. *Floyd Dugas*

■ At the time of the accident, Dugas was thrown from the automobile and received serious multiple injuries, including fractured left clavicle, fractured pelvis, fractured rib and a ruptured bladder.

Immediately following the accident, Dugas was admitted to Lafayette General Hospital where he remained for a period of 10 days. During this initial period of hospitalization, abdominal surgery was performed to repair the ruptured bladder. Additionally, surgery was performed to place a pin in the shoulder fracture. The fractured pelvis did not require surgical intervention.

Mr. Dugas was bedridden at home for several weeks following his initial discharge from the hospital. Dugas began walking approximately eight weeks post accident.

Plaintiff was readmitted to Lafayette General Hospital in September for removal of a portion of the pin which had been inserted to repair the shoulder fracture.

Mr. Dugas' complaints gradually subsided and he was discharged by his treating physician in October, some five months after the accident. Plaintiff continued to have intermittent problems until December, approximately seven months following the accident. After that time, he was essentially symptom free.

The medical testimony revealed that Dugas has a five per cent permanent disability of the shoulder and five per cent permanent disability of each leg (flowing from the fractured pelvis).

At the time of the accident, Mr. Dugas was employed as a roughneck. He was unable to return to his duties for a period of approximately five months following the accident. The parties stipulated that Mr. Dugas' lost wages as a result of this accident were $6,031.19.

The parties further stipulated that plaintiff's medical expenses incurred as a result of this accident were $4,776.30. Dr. Meuleman testified that it was probable that an additional surgical procedure would be required to remove a portion of the pin inserted to repair the fractured shoulder. The

---

9. See *Marcotte v. Travelers Insurance Co.*, 258 La. 989, 249 So.2d 105 (1971); *Prestenbach v. Sentry Insurance Co.*, 340 So.2d 1331 (La. 1976).

10. 539 F.2d 1078 (5th Cir. 1976).

cost of this procedure was estimated at $600.

The evidence reflects that plaintiff had serious multiple injuries which caused severe initial pain and suffering. Fortunately, however, an excellent medical result was obtained and plaintiff was left with minimal permanent disability. I make the following award to plaintiff, Floyd Dugas:

| | |
|---|---|
| Lost wages | $ 6,031.19 |
| Past medical expenses | 4,776.30 |
| Future medical expenses | 600.00 |
| General damages, including pain and suffering, inconvenience, impairment of physical functions and all other general damages sustained as a result of this accident | 25,000.00 |
| TOTAL | $36,407.49 |

A judgment will be entered consistent with this opinion.