**Marcella REED, et al.**

v.

**JOHN DEERE, et al.**

**Civ. A. No. 80–217–A.**

United States District Court, M.D. Louisiana.

June 28, 1983.

Edward J. Walters, Jr., Baton Rouge, La., for plaintiffs.

G. Thomas Arbour, Baton Rouge, La., for plaintiff, Liberty Mut.

Wallace A. Hunter, Baton Rouge, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This is a wrongful death action brought against the manufacturer of a tractor by the surviving wife and children of Charles Reed. The action was commenced in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana and removed to this court by the defendant. The citizenship of all plaintiffs and that of the defendant is diverse and the matter in controversy exceeds $10,000.00. This court has jurisdiction under 28 U.S.C. § 1332(a).

Charles Reed died on January 14, 1980 in Baton Rouge, Louisiana, when a John Deere JD 450–B Crawler Tractor backed over him. At the time of his death he was employed by Thomas Scrap Materials, Inc. as a welder. Intervenor, Liberty Mutual Insurance Company, has intervened asking that it be reimbursed all sums paid as the workmen's compensation insuror of Thomas Scrap Materials.

The machine in question is a diesel powered tracked vehicle referred to by defendants as a crawler tractor and it was manufactured by defendant in 1971.

On the date of the accident the tractor was being operated by William Martin, Jr., when a hose broke, a part of the hydraulic system for lifting the blade. The operator returned to the mechanic shop and backed the tractor to an area near a drain pit. Martin stopped the machine, put the gear lever in the neutral position and turned off the engine. Martin obtained a replacement hose and installed it on the tractor, a process that took an hour or more. He then decided to test the connection to be sure that it was not leaking. Reed at that time was in the shop, positioned near the rear of the tractor, between the tractor and the drain pit. Keeping one hand on the newly installed hose, Martin reached with his other hand and turned on the key and pressed the starter button on the tractor. The engine started and ran for several (three to five) minutes, then the machine issued several unusual sounds and started moving in reverse, toward Reed. Reed turned, saw the tractor moving toward him and attempted to get out of the way. Tragically, however, as Reed was attempting to avoid falling into the drain pit, one of the moving tracks caught his leg, pulling him down and the tractor ran completely over him. It hit another piece of equipment and the wall before eventually coming to a halt. Reed

lived for only a few minutes and he was not conscious after the accident.

Plaintiffs have clearly established a design defect in the tractor, as well as a failure to warn users of the dangerous defect. Defendant insists that the design defect (not conceding that there was one) played no part in the accident because of a material alteration or misuse of the machine after it left the factory. It is necessary to describe the tractor in some detail.

The tractor is equipped with a hydraulic transmission. To cause the machine to move, the operator moves a lever from the neutral position to high or low forward or to reverse. The lever is referred to as the H L R Lever and it is located on the floor of the cab. No clutching is necessary. There is a hinged metal cap or cover which can be placed around the bottom of the H L R Lever when it is in the neutral position which prevents moving the lever to any other position. The H L R Lever is connected through linkage with a spool valve which controls direction by directing oil through a port to either the high, low or reverse clutches. In the neutral position, the oil does not flow at all.

On May 11, 1972, John Deere representatives inspected two tractors because of complaints of shifting into reverse without moving the H L R Lever. This report states, in part:

> Investigation indicates that it is possible for any H–L–R transmission to shift into reverse gear (with T34345 or T37982 shift lever in neutral and the T20831 or AT36672 neutral lock plate engaged) if the shift linkage is not adjusted properly.
>
> After shifting from reverse to neutral, incorrect linkage can allow the shift lever to be in the neutral position while the shift valve is not in the neutral detent position. The valve is almost completely blocking off the port leading to the reverse clutch pack. Leakage past the shift valve can then cause a gradual rise in pressure until the reverse clutch engages.

The report also notes that two other JD450–B tractors were at the same location and that, "By moving the T34845 Reverser Lever from reverse to neutral and engaging the T20832 neutral lock, it was possible to cause both units to shift into reverse."

Defendant received and verified a similar complaint about a third machine. In June, 1972, the defendant issued a "special handling emergency decision" which instructed that all tractors at the factory be checked and the linkage properly adjusted. The defendant also issued a bulletin to its dealers recommending that the H L R adjustment be checked periodically on tractors in service and noting that, "In extreme cases [improper adjustment] could result in leakage past the shift valve which could cause a gradual rise in pressure until the reverse clutch engages," even with the lever in neutral and the neutral lock plate engaged. The bulletin recommended that dealers check the H L R adjustment "whenever the opportunity presents itself."

Subsequently, the defendant discovered that the problem was more than an adjustment problem, it was also a design problem. A report dated June 14, 1972 concluded:

> Examination of tractors recently adjusted per Decision 43570 which are now in the distribution pool indicate[s] (sic) that the new adjustment procedure does not necessarily correct adjustment and for this reason it is felt that an interim testing procedure is needed immediately.

Defendant conducted certain tests and concluded that it should require closer tolerances for all of the parts in the linkage and that the spool valve should be redesigned so as to place the port further from the reverse clutch port when the H L R lever is in the neutral position. Another document from the defendant's file dates in part:

> Decision 49083, effective 4 December, 1972, makes several changes in tolerances on the JD450B Transmission Shift Valve and linkage parts to eliminate the possibility of engaging the clutches when the selector lever is in neutral.
>
> A check of individual parts involved with positioning the shift valve shows them to be within the specified tolerance and the proposed tolerances.

A check of the position of the shift valve with respect to the low, high and reverse ports in the valve housing shows the shift valve normally moves .022 too far into the housing for all shifts. Decision 49083 reduces the shift valve travel into the housing by .020 to improve this condition.

The changes made by Decision 49083 appear to be sufficient to correct the complaint of the tractor moving with the shift lever locked in neutral.

The defendant's records establish that these changes were of minimal cost.

While John Deere installed the redesigned valve in all newly manufactured tractors, it made no effort to replace that part in previously manufactured machines or to replace the linkage with parts manufactured to the new tolerances nor did it make any attempt to communicate either the existence of the problem or the solution to users of the machine.

The Model JD450B tractor is equipped with a safety starter switch designed to prevent the machine from being started except in neutral. When the H L R lever is moved to the neutral position, an activating pin is allowed to make contact with a spring loaded metal ball completing the electrical circuit and allowing the engine to start.

On the day after the accident, it was discovered that the activating pin on the tractor was broken. The machine had been started several times with the lever in neutral position. No attempt had been made to start the machine in any other position.

The defense, is misuse or material alteration of the machine. Defendant claims that sometime prior to the accident, the safety starter was broken, that the machine would not start at all and that someone "bypassed" the safety starter thus allowing the tractor to be started in any gear.

Defendant asserts, that immediately following the accident, the H L R lever was in the reverse position, proving that Martin started the tractor in reverse gear. This conclusion is predicated upon the testimony that Mr. Stanley Liedtke, a long time John Deere engineer with much experience involving the Model JD450B tractor. Mr. Liedtke examined two small photographs, taken on the day of the accident by law enforcement officials, and it was his opinion that these photographs showed the H L R lever in the reverse position. No one examined the tractor immediately following the accident for the purpose of determining the position of the H L R lever and neither of the photographs was taken for that purpose. Neither photograph shows the gear box itself—only the knob and a small portion of the upper end of the curved lever is visible in the photographs. Mr. Liedtke is an expert in the design and manufacture of machines, not photograph interpretation and the court simply does not accept his opinion on that point. The operator of the tractor repeatedly declared under oath that he moved the H L R lever from reverse to neutral before shutting off the engine and, while he could not positively remember engaging the neutral lock, it was his standard practice to do so and he felt that he had done so on that occasion. Defendant, of course, bears the burden of proving its affirmative defense and the court accepts the testimony of the operator and concludes that the H L R lever was in the neutral position when Martin started the tractor after installing the replacement hydraulic hose.

John Deere did show that the neutral safety starter was broken and it was replaced following the accident. The defendant elicited equivocable testimony from the mechanic (not employed by Thomas Scrap Materials) who replaced it as to whether he found that the safety switch had been "bypassed." It is the "by-passing" which defendant claims is the misuse or material alteration of the machine. Defendant argues that if the safety starter device is broken, the machine can not be started at all and, in view of the uncontested evidence that it was repeatedly started both immediately before and after the accident, defendant asserts that someone *must* have taped the wires together. The activating pin on the tractor was broken and wedged in the access housing. The mechanic who main-

tained the tractor denied that he had "bypassed" the safety switch, as did the operator and the shop supervisor. All the Thomas Scrap employees who testified at the trial testified that the tractor would start only in the neutral position. The tractor was moved after the accident and it was started several times on the day following the accident by an expert called by plaintiffs who did not attempt to start it except in the neutral position.

Defendant asserts that it is highly improbable that the neutral safety switch failed upon the very last time that the expert started the tractor and that it must have failed before the accident. Defendant also asserts that Martin was able to start the machine only because of the "by-pass." Plaintiff's expert mechanical engineer has suggested, however, that the switch could have failed, either electronically or mechanically in the "on" position and if that were the case, the tractor would start even though the switch was broken. No one examined the failed switch. Defendant has failed to carry the burden of proving that the neutral safety switch was "by-passed." Thus, the failure of the switch makes no difference in the resolution of this case because I have found that when Martin started the tractor immediately prior to the accident, the H L R lever was in the neutral position and it would have started in that position even if the safety switch was operating properly.

At the time of his death Charles Reed was 64 years old. He married Marcella Reed in 1937 and their union produced eleven children, one of whom died in the Vietnam War. All ten surviving children are now majors, although the youngest had not yet attained majority at the time of Reed's death. One daughter, Juanita, has a physical disability which caused her to be financially dependent upon her father. The Reed family was unusually close and loving. Charles Reed was a good and steady provider; he was prominent in his church and in his community, Woodville, Mississippi. Each of his children was close to him, even those who no longer lived in the Woodville

area and each suffers because of the loss of the father.

Because this is a diversity case, we apply the law of Louisiana.

Under Louisiana law, a manufacturer of a product which involves a risk of injury to the user, is liable to any person, whether the purchaser or a third person, who, without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming the injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect. See *Weber v. Fidelity and Casualty Insurance Company of New York*, 259 La. 599, 250 So.2d 754 (1971). If the product is proven defective by a reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture, for the manufacturer is presumed to know the vices of the things he makes, whether or not he has actual knowledge of them. *Weber v. Fidelity and Casualty Co. of New York, supra.* A manufacturer may be held liable to one injured by a defect in the product—whether in design or manufacture, or which results from the lack of adequate warning—that renders the product unreasonably dangerous to normal use. *Chappuis v. Sears Roebuck & Co.*, 358 So.2d 926 (La.1978). Manufacturer's instructions which accompany the product, are considered to be a part of the design of the product and the manufacturer is obligated to warn the user of potential dangers of which he is aware or could reasonably anticipate. See e.g. *Rey v. Cuccia*, 298 So.2d 840 (La.1974).

"Normal use" is not restricted simply to use for the purpose for which the product was intended, but rather that term extends to all reasonably foreseeable uses. As the court stated in *Fox v. American Steel Building Co., Inc.*, 299 So.2d 364 (La. App. 3d Cir.1974):

"... [T]he law does not require that the manufacturer make the product 'fool-

proof' or 'accident proof'. It does require, however, that it exercise reasonable care in the design and fabrication of its products which are of such a nature that, if not carefully made, can cause foreseeable injuries to persons using the products for purposes by which the manufacturer may reasonably expect them to be used. Failure of the manufacturer to exercise such care renders it liable if injury results from the lawful use of the product in a manner and for a purpose for which the manufacturer may be deemed to reasonably expect." (299 So.2d at 371)

In *Cobb v. Insured Lloyd's,* 387 So.2d 13 (La.App. 3d Cir.1980), the court further commented:

> "Normal use is a matter of foreseeable use and may include something broader than operation exactly in accordance with the manufacturer's instructions...." (387 So.2d at 18)

It is correct that the Operator's Manual furnished by John Deere for the tractor involved in this litigation under the heading, "Starting the Engine," contains the following:

> "CAUTION: Never start the engine unless you are in the operator's Seat."

As Mr. Liedtke freely conceded, it was certainly foreseeable to John Deere that someone might well start the engine of this tractor while not in the driver's seat, in order to check repairs, as Martin was doing at the time of the accident. The defendant has suggested, although not very strongly that starting the tractor in the manner that Martin did was not a normal use. In view of Mr. Liedtke's concession which confirms the court's own views, the court concludes that this tractor was in normal use at the time of the accident despite the fact that the operator was not seated in the operator's seat exactly in accordance with the manufacturer's instructions. *Cobb v. Insured Lloyd's, supra.*

The tractor was unreasonably dangerous for normal use and it was thus defective at the time that it was manufactured. There was no warning of any sort to potential users that an otherwise useful piece of equipment could be transformed into a perilous, mechanical beast capable of independent locomotion and injuries such as that sustained in this case was reasonably foreseeable and it is clear that Charles Reed's death was caused by the defective tractor. Defendant has failed to prove its affirmative defense of abnormal use or material alteration.

Louisiana Civil Code Article 2315 creates the right to maintain a survival action and also grants the right to certain named beneficiaries to sue on their own behalf for the wrongful death of the decedent. The primary class of beneficiaries includes the surviving wife and children of the victim. In the present case, plaintiffs have chosen to pursue both the survival and wrongful death actions.

Damages in a survival action under Article 2315 include the conscious pain and suffering experienced by the deceased as a result of the injury preceding his death. See *Cheatham v. City of New Orleans,* 378 So.2d 369 (La.1980); *McDaniel v. Welsh,* 234 So.2d 833 (La.App. 1st Cir.1970). Mere proof that the decedent was alive, but unconscious, subsequent to the accident, is insufficient to establish a basis for recovery. *McDaniel, supra; Chausse v. Southland Corp.,* 400 So.2d 1199 (La.App. 1st Cir.1981) writs den. sub. nom. *LaSalle v. Southland Corp.,* 404 So.2d 278, 404 So.2d 497 and 404 So.2d 498; *Blancher v. Samuels,* 354 So.2d 213 (La.App. 4th Cir.1977) writs den. 355 So.2d 257 and 355 So.2d 263; *Blanchard v. Rodrigue,* 340 So.2d 1001 (1st Cir.1976) writs den. 341 So.2d 1129 and 341 So.2d 1130. One witness testified that after the accident Reed was alive "but couldn't say anything" and that he moved one leg. In order to support an award for conscious pain and suffering prior to death, Louisiana requires affirmative proof that the decedent was, in fact, conscious after the accident and did suffer pain. *McDaniel v. Welsh, supra,* and Louisiana does not allow recovery for loss of enjoyment of future life. *Chausse v. Southland Corp., supra.*

Consequently, the terror that Reed no doubt experienced when he realized that the machine was going to run over his body is not compensable. Reed must have experienced pain, however, when the machine began to roll over him and before he lost consciousness. This could not have been a period of more than a few seconds and an award of $10,000 is reasonable. Under the Louisiana jurisprudence, this amount must be split equally among all the plaintiffs.

█ Charles and Marcella Reed were, from the evidence, an exceptional couple. They were married but once, to each other, in 1937. They shared a common desire for a large family and they thoroughly enjoyed their family. In addition to their mutual effort to provide their children with a stable and loving home, the Reeds jointly participated in community service and both were active in their church. The testimony indicates that the Reeds enjoyed a close, affectionate relationship strengthened by their many years together. Mrs. Reed, who was 62 years of age at the time of trial, still feels her husband's loss quite deeply. At this stage of her life the adjustment to her husband's untoward absence has no doubt been more difficult than it might have been for a person of younger years. For the loss of her husband's love, affection and companionship, Mrs. Reed will be awarded the sum of $100,000.

Counsel for plaintiff has requested that a separate award be made for "loss of services" provided to Mrs. Reed by her husband. This request is rejected as not being justified by the evidence.

█ Mrs. Reed also claims loss of economic support and an expert economist testified relative to past loss of earnings as well as future loss of earnings caused by Mr. Reed's death. No evidence was offered relative to the amount Mr. Reed customarily spent upon himself or the amount of financial support he offered, if any, to the disabled daughter, Juanita. Neither was there any evidence as to the financial support he provided for his son Xavier who was 17 years of age at his father's death and is certainly entitled to some loss of support until he reached the age of majority, 18. There being no evidence in the record to predicate an award for loss of economic support to either Juanita or Xavier, the court will award Mrs. Reed only on this element of damages.

The expert economist estimated that Mr. Reed had a life expectancy of 13.7 years and a work life expectancy of 6 years, to age 70, at the time of his death. Mrs. Reed testified that her husband was in good health and had no plans to retire at age 65. The court therefore accepts the work life expectancy as being reasonable. Mr. Reed's gross income for the year 1979 was $13,-205.46. The economic expert computed the present value of a projected loss of earnings utilizing a 2.5% annual productivity increase and a 6% annual inflation factor and used a 10% discount rate. That calculation produced a number, 46,326.94, which could represent the gross dollar value of the loss of earnings to age 70. The economic expert also calculated that from the date of death to December 31, 1981, Mr. Reed would have earned $25,860.75. Defendant has not seriously contested these computations and there is no evidence to the contrary. Accordingly, the gross economic loss is calculated at $72,200. There is no evidence in the record concerning Mr. Reed's personal spending habits but the gross amount must be reduced by the amount by which we estimate the deceased would have consumed himself. The court determines that 20% would be an appropriate factor. While that is an arbitrary number, it is in keeping with Louisiana jurisprudence. *Roundtree v. Technical Welding and Fabrication Co.,* 364 So.2d 1325 (La.App. 4th Cir.1978). Mrs. Reed will be awarded the sum of $58,000.00 representing loss of economic support caused by the death of her husband.

█ Each of the ten surviving children is entitled to an award for the love and affection and companionship of which they have been deprived by the death of their father. Each of the Reed children, except Juanita, testified at the trial concerning his or her relationship with Mr. Reed. The evidence shows that all the children main-

tained contact with their parents, even those who no longer live near the Woodville area. It is clear that there were strong family ties established in childhood and that they did not diminish with adulthood. Mr. Reed was still a forceful presence in the lives of his children and his death has deprived them of guidance and affection which can not be replaced.

For their loss, each of the Reed children will be awarded the sum of $25,000.00.

Judgment will be signed in favor of Mrs. Reed in the full amount of $158,910.00 and in favor of each of the Reed children in the amount of $25,910.00 together with legal interest thereon from date of judicial demand until paid.

Intervenor is entitled to judgment in preference to Mrs. Reed's award in the amount of $1,555.00 medical expenses and $20,720.00 compensation benefits paid on behalf of the employer under the Louisiana Workmen's Compensation Act.

Counsel for plaintiff shall prepare formal judgment, present to other counsel for approval as to form and submit it to the court for signature.