495 So.2d 1317 (1986)
TENNECO OIL COMPANY
v.
CHICAGO BRIDGE & IRON COMPANY, et al.
Ronald D. ECKLUND
v.
TENNECO OIL COMPANY, et al.
Lezlie Dolese NUNEZ, etc.
v.
TENNECO OIL COMPANY, et al.
Olga DUBROC, et uc.
v.
TENNECO OIL COMPANY.
Robert D. COLLINS and Nancy L. Collins
v.
TENNECO OIL COMPANY, et al.
Donald A. SOULANT
v.
TENNECO OIL COMPANY, et al.
BURNSED PETROLEUM CORPORATION
v.
TENNECO OIL COMPANY.
Maurice C. JACOB, et al.
v.
TENNECO OIL COMPANY, et al.
Darlene G. FAUST and Jack J. Faust, Jr.
v.
TENNECO OIL COMPANY, et al.
Martin GRANGER
v.
TENNECO OIL COMPANY.
Julienne Newsome NEUMEYER
v.
TENNECO OIL COMPANY.
Lyle RICE and Mary Ellen Rice
v.
TENNECO OIL COMPANY. *1318
Charles J. MERCIER, et al.
v.
TENNECO OIL COMPANY, et al.
Michael GRIFFIN, et al.
v.
TENNECO OIL COMPANY, et al.
Ralph J. SAUCIER, et al.
v.
TENNECO OIL COMPANY, et al.
Ronald D. ECKLUND, et al.
v.
TENNECO OIL COMPANY, et al.
Barbara ECKLUND
v.
TENNECO OIL COMPANY, et al.
Arthur SAVOR, et al.
v.
TENNECO OIL COMPANY, et al.
Nos. CA-4430 to CA-4447.
Court of Appeal of Louisiana, Fourth Circuit.
April 30, 1986.
On Rehearing September 22, 1986.
Writ Granted December 5, 1986.
Writs Denied December 5, 1986.
*1319 Monroe & Lemann, Benjamin R. Slater, Jr., Benjamin R. Slater, III, Julie E. Rodrigue, Mark E. Van Horn, New Orleans, for defendant-appellee Chicago Bridge and Iron Co., Inc.
Walker, Bordelon, Hamlin & Theriot, Alvin J. Bordelon, Jr., Terrence K. Knister, New Orleans, for plaintiff-appellant Tenneco Oil Co.
Hammett, Leake & Hammett, Dominic J. Gianna, John D. Person, New Orleans, for defendant-appellant Fluor Engineers, Inc.
Lozes, Cooper & Lozes, Felicien P. Lozes, New Orleans, for defendant-appellant Graffney, Inc.
Martzell & Thomas, John R. Martzell, Michael W. Robinson, New Orleans, for plaintiffs-appellants Lyle and Mary Ellen Rice.
Donald F. deBoisblanc, Catherine Leary, New Orleans, for plaintiffs-appellants Ronald Ecklund, et al., Ralph Saucier, et al., Donald Soulant, et al., Charles Mercier, et al., and Arthur Savoy, et al.
Frederick A. Miller & Associates, James C. Cockfield, New Orleans, for intervenor Hartford Acc. & Indem.
Before GULOTTA, SCHOTT, BYRNES, LOBRANO and WILLIAMS, JJ.
Writ Granted December 5, 1986 in Docket No. 86-C-1055.
Writs Denied December 5, 1986 in Docket Nos. 86-C-2085 and 86-C-2086.
BYRNES, Judge.
The sole question raised in this appeal is the applicability of La.R.S. 9:2772 to the various causes of action asserted in these consolidated cases by Tenneco and others against Chicago Bridge and Iron Company (CBI). The trial court ruled in favor of CBI, holding the causes of action perempted. We affirm.
On August 31, 1983 a fire occurred at Tank # 68 located on the premises of the Tenneco Refinery at Chalmette, La. As a result of that fire, a multitude of law suits were filed for personal injuries and property damage. As owner of Tank # 68, Tenneco *1320 was made a defendant in all of these suits. Tenneco filed third party demands against Fluor Engineers, Inc. and its subcontractor, Gaffney, Inc., who at the time of the fire, were engaged in construction work in the area of Tank # 68. Tenneco also third-partied CBI, the builder of Tank # 68, asserting defects in design and construction. In addition, Tenneco filed a separate suit against all of the above named parties seeking damages for its own property losses.
Gaffney and Fluor third partied CBI, alleging defects in design and/or construction. Gaffney also amended its third party demand to allege in the alternative that CBI failed to warn Tenneco and others of a potentially dangerous use of the tanks it built.
CBI filed exceptions to all claims on the grounds that the ten year peremptive period of La.R.S. 9:2772[1] barred any action against a contractor involving deficiencies in the survey, design, supervision or construction of an immovable. The trial court granted the exception and dismissed all claims against CBI. This appeal followed.
It is not disputed that Tenneco owns Tank # 68 or that CBI constructed it in 1967. Nor is it disputed that more than ten years have passed since Tenneco took possession of the tank and CBI last performed any work on it. The determinative issue before the trial court was whether the tank was an immovable or an improvement to an immovable.
In 1979, the legislature revised the Civil Code Articles dealing with property, including Articles 462 & 463 which define an immovable.
Among the issues raised by the parties to this appeal is the question of which version of the relevant articles applies to this case. In the instant matter, the operative facts which gave rise to this action occurred in 1983 when the tank caught fire and burned. We therefore hold that the 1978 revision should be used to determine the classification of Tank # 68. P.H.A.C. Services, Inc. v. Seaways International, Inc., 403 So.2d 1199 (La.1981).
Article 462 of the Civil Code provides that:
Tracts of land, with their components parts, are immovables.
Article 463 defines component parts as follows:
Buildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or ungathered fruits of trees, are component parts of a tract of land when they belong to the owner of the ground.
In P.H.A.C. Services, supra, the Supreme Court noted that the 1978 revision effected several changes in the prior law. One of the changes noted by the Court was that:
"Constructions other than buildings are now classified as movables unless they are component parts of a tract of land.

*1321 To be a component part of a tract of land, a construction must meet two requirements: it must be permanently attached to the ground, and it must belong to the owner of the ground." P.H.A.C. Services, supra at 1203.
There is no dispute regarding Tenneco's ownership of the land and the tank. We consider the tank to be an "other construction" under C.C. Art. 463 and must therefore address the meaning of the phrase "permanently attached to the ground."
In Graffagnino v. Lifestyles, Inc., 402 So.2d 742 (La.App.4th Cir.1981), this court held that a structure described as an "O'Dome", which was designed to be portable and rest on a wooden platform, was an immovable. The Court reasoned that:
"While the O'Dome is designed to be portable, it is also designed to withstand storms and high winds. Therefore, when in use, it is designed to have a degree of permanency.
When used as a dwelling it is integrated with the soil and stationary. It is movable only when disassembled, i.e. not in use." Id at 744
The Graffagnino court cited with approval the First Circuit's reasoning in Ellis v. Dillon, 345 So.2d 1241 (La.App. 1st Cir. 1977) to the effect that courts must determine what buildings or other constructions qualify as an immovable in light of the social needs of the time.
We are of the opinion that when interpreting the phrase "permanently attached" as used in C.C. Art. 463, the emphasis should be on the word "permanent". As held by this Court in Graffagnino, supra, permanence when in use is a decisive factor. The degree of attachment is one way of measuring permanence. Some objects, such as the housetrailer in Ellis, supra, and the O'Dome in Graffagnino, supra, require a lesser degree of attachment to establish their permanency, while others require a greater degree of attachment. See Melyn Industries v. Sofec Inc., 392 So.2d 733 (La.App. 3rd Cir.1980).
The facts of this case show that Tank # 68 stood 40 feet high, was 150 feet in diameter and possessed a storage capacity of 125,000 barrels. The tank was grounded, presumably for electrical purposes, by four copper clad rods connected to it and driven into the ground. The tank, when empty, weighed about 441 tons. Its foundation consisted of compacted sand, reinforcing steel, and concrete. This foundation is referred to as a ringwall. No pilings were driven under the ringwall, however the foundation was designed to support the tank against the uneven settlement of Louisiana soils. It was not fastened to the ground or the ringwall by any bolts or other mechanisms.
The evidence also shows that tanks similar to Tank # 68 could be disassembled and moved to another site. However, there is also testimony that while it is physically possible to move the tank intact by barge, such a procedure would be extremely costly and involved. Tank # 68 remained in the same place from the time it was completed in 1967, until the time it was destroyed in 1983.
Under these circumstances, we hold that the tank was a component part of the land under the provisions of article 463, and thus meets the legal definition of an immovable under Article 462. Based on the evidence before us, we find that the tank was designed and built to be a permanent structure at the Tenneco refinery. Although Tenneco urges that the lack of actual fasteners or bolts holding the tank to the ground or the foundation should be the determining factor, we do not interpret attachment in such a restrictive manner. Even though we agree that size alone should not be determinative in deciding status, we are practical enough to realize that it is not necessary to bolt a structure of the size and weight of Tank # 68 to the ground to insure its stability. Modern technology does not require it, and a legal interpretation must consider today's society, not one of 50 years ago. We are of the opinion that the tank was designed and built for permanence, and therefore is an immovable.
Having decided that tank # 68 should be classified as an immovable, we *1322 next address the issue of CBI's status. To be entitled to the benefits of R.S. 9:2772, CBI must have established that it was a contractor. Gaffney argues that CBI was the manufacturer of the tank and therefore is not included in the scope of R.S. 9:2772. We do not agree.
CBI's status must be determined within the factual context of this case. At the trial of its peremptory exception, CBI introduced its contract with Tennecco which was entitled "Construction Contract." CBI also introduced the contractor's license it obtained from the state for this job which listed CBI as a "speciality contractor." The contract was subject to a use tax on materials but was exempt from sales tax. On site construction work took almost three times as many man hours as fabrication of the tank components. Construction costs accounted for over half of the contract price exclusive of materials. From the foregoing, it is apparent that assembly and installation was more then a trifling part of the agreementin fact it was the major part of the contract. The cost of construction and installation exceeded the other contract costs. In short, this contract involved a good deal more than the sale of materials or a tankit was primarily concerned with the furnishing of labor and skill in the construction of the tank.
Under these circumstances, we agree with the trial judge that CBI's contract with Tenneco was a construction contract. See P.P.G. Industries v. Schega, 362 So.2d 1128 (La.App. 4th Cir.1978), Jefferson Parish School Board v. Rowley Co., 350 So.2d 187 (La.App. 4th Cir.1977), Airco Refrigerating Service v. Fink, 134 So.2d 880 (La. 1961), Papa v. Louisiana Metal Awning Co., 131 So.2d 114 (La.App. 2nd Cir.1961), KSLA-TV Inc. v. Radio Corp. of America, 501 F.Supp. 891 (W.D.La.1980). See also Litvinoff, 7 Louisiana Civil Law Treatise-Obligations, Sec. 158 (1975).
Having found that tank # 68 was an immovable and that CBI was a contractor, we uphold the application of R.S. 9:2772 as a bar to all causes of action asserted against CBI for damages as a result of design or construction defects.
However, this holding does not end our query. Gaffney further argues that even if R.S. 9:2772 bars their claims for design and/or construction deficiencies, it does not perempt the cause of action alleged in paragraph 14 of its first amended third-party complaint. That paragraph alleges that:
Alternatively, the tanks sold and/or manufactured by Chicago Bridge & Iron Company was not defective in its design, construction or installation but rather was purposely designed to allow for the gasoline stored therein to partially vaporize when gasoline stored therein would become heated by the tank's exposure to the sun or through the increased weather temperature which vapors would be purposely trapped and not vented so that the vapors would condense into the liquid state upon the cooling of the gasoline in the tank which came about through the cooling effect of rain and/or night fall. This trapping of vapors in the tank prevented the loss of product through evaporation and/or vaporization and further prevented the exhaust of gasoline vapors and thus minimized a fire hazard. Sometime prior to 1981, Chicago Bridge & Iron Company learned that refineries using this type of floating roof might be injecting "slugs of air" or other noncondensable gases into the tank in the operating processes of the refinery including the purging of lines leading to the tank. CBI learned that the injection of air or other noncondensable gases into the tank might alter the floatation of the roof and thus allowing for a failure thereof and in turn allowing for the gasoline stored within the tank to go onto the top of the roof and from there through the rain drain into the dike area adjacent to the tank. CBI knew of the dangers of gasoline being placed in the dike area in the aforesaid manner and knew of the dangers caused by the vaporization of gasoline openly exposed to the atmosphere adjacent to the tank and further knew that Tenneco continued to own and control Tank Number 68 but failed to advise or warn Tenneco and/or others of the consequences of the injection of "slugs *1323 of air" and/or other noncondensable gases into the aforesaid tank.
Gaffney contends that these allegations state a cause of action for failure to warn which is independent of design or construction issues. We do not agree.
In our opinion, Gaffney's amended petition is alleging a design defectthe tank was not designed to include a warning to users of the tank that the injection of non-condensable gas could cause it to malfunction and allow gasoline to escape.
The instruction and warnings given with respect to the operating capabilities and limitations of a product are a significant part of its overall design. Reed v. John Deere, 569 F.Supp. 371 (M.D.La.1983), LeBoeuf v. Goodyear, 451 F.Supp. 253, 57 (W.D.La.1978); See also Rey v. Cuccia, 298 So.2d 840 (La.1974), Sec. 402A Restatement of Torts 2nd, Comment J. A properly designed product must include warnings or instructions so that users of the product can be aware of its limitations. Without the proper warnings the design of a product may be unreasonably dangerous.
In our opinion, that appears to have been the case here. The record is clear that CBI designed and built the tank in accordance with the size and materials specifications supplied by Tenneco. By not including a warning concerning the use of non-condensable gases in the tank, CBI produced a defective design. Defect in design is clearly one of the causes of action perempted by R.S. 9:2772. In spite of Gaffney's conclusory allegations that the tank was not defective, the entire thrust of paragraph 14 is that CBI failed to warn of a deficiency or limitation in the design of the tank. The trial court was therefore correct in concluding that the cause of action asserted by Gaffney in paragraph 14 of its first supplemental and amending third party petition arose out of the design of the tank and was perempted by the passage of 10 years.
Moreover, our review of the record reveals that Gaffney produced no evidence in support of its failure to warn theory at the hearing on CBI's exception of peremption. No evidence was introduced showing that CBI knew that anyone was injecting non-condensable gas into the tanks it designed or that it was dangerous for them to do so. Nor was any evidence produced at trial showing the CBI had actually failed to warn of the alleged danger.
Once CBI established that more than 10 years had elapsed since the tank was completed and accepted by Tenneco, the burden of proof shifted to Tenneco and Gaffney to show that peremption did not apply. They failed to do so.
Gaffney's belated attempt to introduce its evidence by attaching it to both its trial and appellate briefs is of no avail. Items of evidence which are physically placed in the record, but which are not introduced and accepted in evidence by the trial court may not be considered in deciding the merits of the case. State Department of Highways v. Colby, 321 So.2d 878 (La.App. 1st Cir.1975), writ denied 325 So.2d 278 (La.1976).
Thus, although Gaffney's evidence was attached to the memorandum it submitted to the trial court, and is therefore physically part of the record in this case, it was never introduced or accepted as evidence and cannot be considered in deciding the merits of the exception of peremption.
For the foregoing reasons the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.
GULOTTA, J., dissents.
LOBRANO, J., dissents in part.
GULOTTA, Judge, dissenting.
I dissent for the reasons assigned by Lobrano, J.
LOBRANO, Judge, dissenting in part.
I respectfully dissent from the portion of the majority opinion which holds that La. R.S. 9:2772 perempts the cause of action stated in paragraph 14 of Gaffney's first amended complaint.[1]
*1324 Essentially, that paragraph states that, in the alternative, there were no design or construction defects, but that sometime prior to 1981, CBI learned that injection of air or other noncondensable gases into the tank might alter the flotation of the roof thus creating a potentially dangerous condition. It is further alleged that CBI, upon obtaining this knowledge had a duty to warn Tenneco and failed to do so. They argue that this failure to warn of a dangerous propensity in that particular use of the tank is an action that is not perempted by R.S. 9:2772.
In support of their position Tenneco and Gaffney cite the cases of Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La.1985), and Walker v. Maybelline Co., 477 So.2d 1136 (La.App. 1st Cir.1985 No. CA-0225). In Winterrowd the Supreme Court held a manufacturer liable for failure to warn of a dangerous condition that could occur during the normal use of a punch press it manufactured in 1907, even though the injuries occurred in 1976. In Walker, plaintiff recovered from Maybelline on the theory that the mascara manufacturer failed to warn of the dangers inherent with the application and use of its product. Particular attention is focused on the concurring opinion of Judge Crain wherein he points out that the product itself was not defective in manufacture or design, but that liability attaches because the manufacturer failed to warn of the dangerous propensity in the use of its product.
CBI argues that the failure to warn allegation is merely another means of asserting a cause of action for design or construction defect and that it should be perempted by the provisions of R.S. 9:2772. They point out that the cases cited by Tenneco and Gaffney, Inc. in support of their position deal with a manufacturer, not a contractor and thus are readily distinguishable.
Both sides refer to the Federal Fifth Circuit case of KSLA-TV, Inc. v. Radio Corp. of America, 732 F.2d 441 (5th Cir. 1984) in support of their respective positions. Although that case held that the failure to warn allegation of KSLA was barred by R.S. 9:2772, that decision was based on the plaintiff's apparent lack of allegations and/or proof of a duty to warn.
I do not disagree with CBI's claim that they are a contractor, and not a manufacturer. The evidence clearly supports this claim. Nor do I disagree with Tenneco that the law in Louisiana with respect to a manufacturer requires that adequate warnings be given of any danger inherent in the normal use of its product not within the knowledge of the ordinary user. Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). However, the issue is whether a contractor has a similar duty to warn, and if so, whether a breach of that duty is perempted by R.S. 9:2772.
In the context of this case, I would answer the first question in the affirmative. I would hold that a contractor who acquires knowledge of a danger inherent in the ordinary use of that which he constructed has a duty to warn, at the very least, the owner. I am of the opinion he also has a duty to warn if he has knowledge that the owner's actual use of that which he constructed creates a danger where the owner's use would otherwise be considered normal. This duty of a contractor is based on the fundamental principles of negligence.
"Negligence ... is found either in the violation of a duty prescribed by a statute ordinance or administrative regulation or from a consideration of the three R's: the relationship of the parties, the risks involved in the transaction or conduct, and an appraisal of what a reasonable man would do or refrain from doing under these circumstances."
Stone, Tort Doctrine, Louisiana Civil Law Treatise (1977) at 413.
The relationship between contractor and owner arises because of the obligations incurred by each in the construction contract. The owner expects his structure to be built in a competent, workmanlike manner, free of vices and defects. The contractor guarantees that he is capable of performing such a task, and holds himself to the public as qualified to do so. In so doing, the contractor presents himself as experienced and competent to perform a job that the *1325 owner lacks the expertise to do himself. The contractor is in a better position than the ordinary person to learn of the dangers that may exist in the use of that which he built. The "reasonable man" contractor should warn those that he contracted with of the dangers he may subsequently learn of.
The title of La. Acts 1964, No. 189 which enacted R.S. 9:2772 and which is indicative of its object, provides in part:
"... a new section to be designated as Section 2772, limiting the time within which actions may be brought for deficiencies in design, planning, inspection, supervision or construction of improvement to immovable property or for property damage, personal injury or wrongful death arising from any such deficiency."
In Academy Park Improvement Association v. City of New Orleans, 469 So.2d 2 (La.App. 4th Cir.1985) we held that the term "deficiency" could not be extended to include allegedly fraudulent planning and building. We further concluded that R.S. 9:2772 does not purport to limit every action against someone who once built a building. A prescriptive or peremptive statute cannot be extended by analogy. R.S. 9:2772 forever bars and extinguishes all causes of action encompassed by it, Bordlee v. Neyrey Park, Inc., 394 So.2d 822 (La.App. 4th Cir.1981), and because it "closes the courtroom door" to a litigant, it must be given strict interpretation. I cannot perceive that the legislature intended to allow a contractor to escape liability thru the application of La.R.S. 9:2772 where he has knowledge of dangers in the use of that which he built and fails to warn the owner. I would hold that La.R.S. 9:2772 does not bar the cause of action asserted by Gaffney in their amended pleadings as set out in the attached exhibit. Accordingly, I dissent.

EXHIBIT A

14.
Alternatively, the tanks sold and/or manufactured by Chicago Bridge & Iron Company was not defective in its design, construction or installation but rather was purposely designed to allow for the gasoline stored therein to partially vaporize when gasoline stored therein would become heated by the tank's exposure to the sun or through the increased weather temperature which vapors would be purposely trapped and not vented so that the vapors would condense into the liquid state upon the cooling of the gasoline in the tank which came about through the cooling effect of rain and/or night fall. This trapping of vapors in the tank prevented the loss of product through evaporation and/or vaporization and further prevented the exhaust of gasoline vapors and thus minimized a fire hazard. Sometime prior to 1981, Chicago Bridge & Iron Company learned that refineries using this type of floating roof might be injecting "slugs of air" or other noncondensable gases into the tank in the operating processes of the refinery including the purging of lines leading to the tank. CBI learned that the injection of air or other noncondensable gases into the tank might alter the floatation of the roof and thus allowing for a failure thereof and in turn allowing for the gasoline stored within the tank to go onto the top of the roof and from there through the rain drain into the dike area adjacent to the tank. CBI knew of the dangers of gasoline being placed in the dike area in the aforesaid manner and knew of the dangers caused by the vaporization of gasoline openly exposed to the atmosphere adjacent to the tank and further knew that Tenneco continued to own and control Tank Number 68 but failed to advise or warn Tenneco and/or others of the consequences of the injection of "slugs of air" and/or other noncondensable gases into the aforesaid tank.

ON REHEARING
LOBRANO, Judge.
We granted a rehearing in this matter to reconsider only the question of whether the cause of action stated in paragraph 14 of Gaffney's first amended complaint is barred by La.R.S. 9:2772. This Court reaffirms the unanimous position expressed in its original opinion that the tanks in question are immovables.
*1326 Essentially paragraph 14 of Gaffney's first amended complaint states that, in the alternative, there were no design or construction defects, but that sometimes prior to 1981, CBI learned that injection of air or other noncondensable gases into the tank might alter the flotation of the roof thus creating a potentially dangerous condition. It is further alleged that CBI, upon obtaining knowledge had a duty to warn Tenneco and failed to do so. They argue that this failure to warn of a dangerous propensity in that particular use of the tank is an action that is not perempted by R.S. 9:2772.
In support of their position Tenneco and Gaffney cite the cases of Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La.1985), and Walker v. Maybelline Co., 477 So.2d 1136 (La.App. 1st Cir.1985). In Winterrowd the Supreme Court held a manufacturer liable for failure to warn of a dangerous condition that could occur during the normal use of a punch press it manufactured in 1907, even though the injuries occurred in 1976. In Walker, plaintiff recovered from Maybelline on the theory that the mascara manufacturer failed to warn of the dangers inherent with the application and use of its product. Particular attention is focused on the concurring opinion of Judge Crain wherein he points out that the product itself was not defective in manufacture or design, but that liability attaches because the manufacturer failed to warn of the dangerous propensity in the use of its product.
CBI argues that the failure to warn allegation is merely another means of asserting a cause of action for design or construction defect and that it should be perempted by the provisions of R.S. 9:2772. They point out that the cases cited by Tenneco and Gaffney, Inc. in support of their position deal with a manufacturer, not a contractor and thus are readily distinguishable.
Both parties refer the court to the Federal Fifth Circuit case of KSLA-TV, Inc. v. Radio Corp of America, 732 F.2d 441 (1984) in support of their respective positions. Although that case held that the failure to warn allegation of KSLA was barred by R.S. 9:2772, that decision was based on the plaintiff's apparent lack of allegations and/or proof of a duty to warn.
We do not disagree with CBI's claim that they are a contractor, and not a manufacturer. The evidence clearly supports this claim. Nor do we disagree with Tennaco that the law in Louisiana with respect to a manufacturer requires that adequate warnings be given of any danger inherent in the normal use of its produce not within the knowledge of the ordinary user. Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). However, the issue is whether a contractor has a similar duty to warn, and if so, whether a breach of that duty is perempted by R.S. 9:2772.
In the context of this case, we answer the first question in the affirmative. We hold that a contractor who acquires knowledge of a danger inherent in the ordinary use of that which he constructed has a duty to warn, at the very least, the owner. He also has a duty to warn if he has knowledge that the owner's actual use of that which he constructed creates a danger where the owner's use would otherwise be considered normal. This duty of a contractor is based on the fundamental principles of negligence.
"Negligence ... is found either in the violation of a duty prescribed by a statute ordinance or administrative regulation or from a consideration of the three R's: the relationship of the parties, the risks involved in the transaction or conduct, and an appraisal of what a reasonable man would do or refrain from doing under these circumstances." Stone, Tort Doctrine, Louisiana Civil Law Treatise (1977) at 413.

The relationship between contractor and owner arises because of the obligations incurred by each in the construction contract. The owner expects his structure to be built in a competent, workmanlike manner, free of vices and defects. The contractor guarantees that he is capable of performing such a task, and holds himself to the public as qualified to do so. In so doing, the contractor presents himself as experienced and competent to perform a job that the *1327 owner lacks the expertise to do himself. The contractor is in a better position than the ordinary person to learn of the dangers that may exist in the use of that which he built. The "reasonable man" contractor should warn those that he contracted with of any dangers he may subsequently acquire knowledge of.
Having determined that there is a duty on the contractor to warn, we face the final question of whether an alleged breach of that duty is perempted by R.S. 9:2772.
The title of La.Acts 1964, No. 189 which enacted R.S. 9:2772 and which is indicative of its object, provides in part:
"... a new section to be designated as Section 2772, limiting the time within which actions may be brought for deficiencies in design, planning, inspection, supervision or construction of improvement to immovable property or for property damage, personal injury or wrongful death arising from any such deficiency."
In Academy Park Improvement Association v. City of New Orleans, 469 So.2d 2 (La.App. 4th Cir.1985) we held that the term "deficiency" could not be extended to include allegedly fraudulent planning and building. We further concluded that R.S. 9:2772 does not purport to limit every action against someone who once built a building. A prescriptive or peremptive statute cannot be extended by analogy. R.S. 9:2772 forever bars and extinguishes all causes of action encompassed by it, Bordlee v. Neyrey Park, Inc., 394 So.2d 822 (La.App. 4th Cir.1981), and because it "closes the courtroom door" to a litigant, it must be given strict interpretation. We cannot perceive that the legislature intended to allow a contractor to escape liability thru the application of La.R.S. 9:2772 where he has knowledge of dangers in the use of that which he built and fails to warn the owner. We therefore hold that La.R.S. 9:2772 does not bar the cause of action asserted by Gaffney in their amended pleadings as set out in the attached exhibit.[1]

DECREE
Accordingly, we affirm that portion of the trial court's judgment which dismisses all claims against CBI based on defects in the design and/or construction of the tank. We reverse that portion of the trial court judgment which dismisses the causes of action for failure to warn asserted by Gaffney in its amended third party complaint.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
BYRNES and WILLIAMS, JJ., dissent with reasons.
BYRNES and WILLIAMS, Judges, dissenting.
I must respectfully dissent from that portion of the majority opinion which imposes a duty to warn on contractors and then finds that this duty is not pre-empted by R.S. 9:2772.
In the first place, I am not convinced that imposing a duty to warn on contractors is sound policy. To say that CBI had a duty to warn in this case is to treat it like a manufacturer. The majority specifically (and correctly) concludes that CBI was not a manufacturer, yet holds it to the same standard of care as one. The majority's justification for blurring this distinction is that "... the contractor is in a better position than the ordinary person to learn of the dangers that might exist in the use of that which he built." This in my opinion is not sufficient to justify such a significant addition to the duty which a contractor owes to the owner of a structure.
However, even assuming the existence of a duty to warn, I believe that claims based on a breach of that duty are barred by R.S. 9:2772. The majority states that: "The duty [to warn] of a contractor is based on the fundamental principles of negligence", *1328 but then goes on to find that the provisions of R.S. 9:2772 do not apply to this negligence based duty. This position ignores the clear intent of the legislature in enacting the statute. That intent, as expressed in Sec. A of R.S. 9:2772, was to assure that "no action, whether ex contractu, ex delicto or otherwise ..." be brought against a contractor more than ten years from acceptance of the work by the owner.
As discussed more fully in the original opinion it is my opinion, that the defect, if any, which caused the injuries in this case was one of design. The floating roof was not designed to tolerate the injection of certain gases which are commonly used in the industry. From the language of R.S. 9:2772 it seems beyond question that the legislature intended its provisions to apply to all negligence based claims arising out of the design or construction of immovables, including failure to warn of dangers in the design of an object. Moreover, because Gaffney the only party to urge the failure to warn theory was dismissed from the suit on a finding of no liability, this issue appears moot. For these reasons, as well as those expressed in the original opinion, I would affirm the judgment of the trial court in its entirety.
NOTES
[1] La.R.S. 9:2772 provides, in pertinent part:

"A. No action, whether ex contractu, ex delicto, or otherwise, to recover on a contract or to recover damages shall be brought against any person performing or furnishing land surveying services, as such term is defined in the first paragraph of R.S. 37:682(9), including but not limited to those services preparatory to construction, or against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of an improvement to immovable property.
(2) If no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, more than ten years after the improvement has been occupied by the owner;
B. The causes which are preempted (sic) within the time described above include any action:
(1) For any deficiency ... in the design, planning, inspection or observation of construction, or in the construction of any improvement to immovable property;
(2) For damage to property, movable or immovable, arising out of any such deficiency;
(3) For injury to the person or for wrongful death arising out of any such deficiency; and
(4) Any action brought against a person for the action or failure to act of his employees. This pre-emptive (sic) period shall extend to every demand whether brought by direct action or for contribution or indemnity or by third party practice, and whether brought by the owner or by any other person."
[1] A copy is attached hereto as an Exhibit.
[1] In reaching this conclusion we point out that we did not consider those documents which were the subject of CBI's Motion to Strike, as those documents were not properly introduced into evidence and are therefore not before this court.

We also point out that we did not address the arguments of Tenneco and Gaffney, Inc. that R.S. 9:2772 is unconstitutional since the Supreme Court resolved that issue in Burmaster v. Gravity Drainage District No. 2, 366 So.2d 1381 (La.1978).